Balachandran RAJARATNAM and Arudshankar Arulanantham, Petitioners,

v.

A.D. MOYER, District Director of the Immigration and Naturalization Service, Respondent.

No. 93 C 2556.

United States District Court, N.D. Illinois, E.D.

Sept. 17, 1993.

**1220**

David Rubman, Law Office of David Rubman, Chicago, IL, for petitioners.

James Hoofnagle, Asst. U.S. Atty., Chicago, IL, for respondent.

*MEMORANDUM OPINION
AND ORDER*

ASPEN, District Judge:

Balachandran Rajaratnam and Arudshankar Arulanantham bring this petition for a writ of habeas corpus pursuant to § 106(b) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1105a(b). Petitioners ask this court to review the Board of Immigration Appeals' (BIA) decision denying their appli-

cations for asylum and withholding of deportation. For the reasons set forth below, we reverse in part and affirm in part.

## I. BACKGROUND

The underlying facts are not in dispute. Petitioners are citizens of Sri Lanka and ethnic Tamils.[1] Each was detained by the INS in Chicago when their airplane flights to Canada stopped at O'Hare International Airport. The INS agents determined that petitioners were travelling on false documents and instituted exclusion proceedings. Although neither petitioner intended to stay in the United States, they applied for political asylum and withholding of deportation to prevent their return to Sri Lanka. These applications were denied by immigration judges, and the Board of Immigration Appeals affirmed both decisions. The specific facts of each petitioner's case is set forth below.

### A. Balachandran Rajaratnam

Petitioner Balachandran Rajaratnam is twenty-eight years old. Beginning in 1987, he and his family found themselves in the midst of fighting between the Sri Lankan army and the Tamil Tigers (LTTE), a militant Tamil separatist group. During the course of an extended firefight in his hometown of Jaffna, his father was killed in cross fire, and the family's home and store were burned. The family moved to another village where, in 1988, Rajaratnam was arrested by the Indian Peacekeeping Force (IPKF) and the Eelam People's Revolutionary Liberation Front (EPRLF), organizations which acted in cooperation with the Sri Lankan government against the LTTE. Although Rajaratnam has never been a member of the LTTE, he was accused of transacting business with the LTTE, and asked to identify members of the LTTE. He was held for five or six months, during which he was routinely beaten with bamboo and coconut sticks.

After his release, he was required to report to the IPKF monthly. Each time he reported, he was held for two or three days.

---

1. The Tamils are an ethnic minority within Sri Lanka; they constitute approximately 15% of the population.

After a few months, he moved to Colombo, the capital in the south of Sri Lanka, where he lived with a relative. In March, 1989, he was arrested by the Sri Lankan army and local police, who suspected him of membership in the LTTE. He was held in the army jail for three and one-half months, where he was deprived of food, beaten with rifle butts, had his head held underwater, and was held upside down by his legs for ten to fifteen minutes at a time, all in an effort to force him to identify LTTE members, though he consistently denied membership in the LTTE. During this time, he was never taken to court or charged with a crime. He was ultimately released after the intervention of his uncle, who bribed an official.

Rajaratnum returned to northern Sri Lanka when the IPKF withdrew from the region. He was approached by the LTTE, but refused to join them or fight on their behalf, so he was forced at gunpoint to dig trenches, collect firewood, and cook. He soon thereafter fled the LTTE and returned to Colombo, where he was required to sign in at the police station on a regular basis. Each time he went to sign in, he was held for two or three days, questioned about LTTE activities and membership, deprived of food, and beaten with wooden sticks. To escape the danger he routinely faced in Sri Lanka, he arranged with a relative in Canada to get false Canadian papers, and left the country for Canada in July, 1992. He was stopped at O'Hare International Airport when he presented the false documents.

### B. Arudshankar Arulanantham

Petitioner Arudshankar Arulanantham is eighteen years old. He originally lived in Jaffna, in northern Sri Lanka, but was recruited by the EPRLF shortly after he completed tenth grade. However, he did not wish to join the EPRLF, and wanted to escape the civil strife afflicting the region, so he fled to Colombo. One week after he arrived in Colombo, he was arrested at his hotel by the police, who suspected that he was a member of the LTTE. He was held at the police station for one and one-half months, where he was repeatedly interrogated about the LTTE. The police limited the food available to him, and held his head under water for one to two minutes during his interrogations. However, he was never charged with any crimes, nor was he ever brought before a judge. He was released after his mother presented evidence that he was a student, but the police required that he sign in at the police station daily. Although he initially complied, he was afraid that he would be arrested and unable to complete his education. Ten days after his release, in October, 1992, he obtained fake Canadian papers and fled the country for Canada, where his uncle resides. He was stopped at O'Hare International Airport when he presented the false documents.

## II. LEGAL STANDARDS

### A. Standards of Review

The BIA's factual findings and legal conclusions are subject to different standards of review. We review the BIA's factual determinations under a substantial evidence standard. *Kaczmarczyk v. INS*, 933 F.2d 588, 593 (7th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 583, 116 L.Ed.2d 608 (1991). By contrast, review of the BIA's legal conclusions and interpretations of the INA is *de novo*. *Id.* However, we must defer to the BIA's interpretation of the INA, so long as that interpretation is reasonable. *Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984); *Zalega v. INS*, 916 F.2d 1257, 1259 (7th Cir.1990).

### B. Requirements for Asylum/Withholding of Deportation

In order to be eligible for asylum, an alien must initially demonstrate that he is a refugee within the meaning of 8 U.S.C. § 1101(a)(42)(A). 8 U.S.C. § 1158. "Refugee" is defined as

any person who is outside any country of such person's nationality ... and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion....

8 U.S.C. § 1101(a)(42)(A) (1982). Thus, to be eligible for asylum an alien must demonstrate either past persecution or a well-founded fear of persecution if he or she were to be returned. *Zalega,* 916 F.2d at 1260. If the applicant is successful in establishing refugee status, then the Attorney General has discretion to grant asylum. 8 U.S.C. § 1158(a); *INS v. Elias–Zacarias,* —— U.S. ——, ——, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992); *Sivaainkaran v. INS,* 972 F.2d 161, 163 (7th Cir.1992).

■ In order to be eligible for mandatory withholding of deportation, an alien must demonstrate a clear probability that he will be subject to persecution on account of "race, religion, nationality, membership in a particular social group, or political opinion" in the event that he is deported. 8 U.S.C. § 1253(h) (1982); *INS v. Stevic,* 467 U.S. 407, 413, 104 S.Ct. 2489, 2492, 81 L.Ed.2d 321 (1984). "Clear probability" means that such persecution is "more likely than not." *Stevic,* 467 U.S. at 425, 104 S.Ct. at 2498. The "persecution or well-founded fear of persecution" standard for asylum is more lenient than the "clear probability of persecution" standard for withholding of deportation. *See INS v. Cardoza–Fonseca,* 480 U.S. 421, 448–50, 107 S.Ct. 1207, 1221–23, 94 L.Ed.2d 434 (1987).

## III. DISCUSSION

■ Because the standard for granting asylum is more lenient than that for withholding of deportation, we address first the petitioners' claims for asylum. If the petitioners have failed to establish that they are eligible for asylum, then it follows that they are also ineligible for withholding of deportation. *See Balazoski v. INS,* 932 F.2d 638, 641 (7th Cir.1991). The BIA found that the petitioners were not refugees, and were thus ineligible for asylum, because they had not been persecuted *on account of* one of the enumerated statutory criteria.[2] Rather, the BIA concluded that the Sri Lankan government was merely exercising its legitimate

right to investigate terrorist activity, and that the abuse suffered by the petitioners at the hands of the authorities was merely evidence of general human rights abuses in Sri Lanka, and not on account of the statutory criteria. The BIA also noted that Tamils participate in the Sri Lankan government, and Tamil organizations are working with the government to find a peaceful solution to Sri Lanka's civil strife.

We are unconvinced by the BIA's rationale for denying petitioners relief; indeed, much of its analysis seems entirely inapposite. The BIA opinions and the government emphasize recent Tamil cooperation with and participation in the Sri Lankan government. However, petitioners are not claiming that they were persecuted because they are Tamils. Rather, the petitioners argue that they were singled out as members or supporters of the Tamil Tigers (LTTE), and it is because of this imputed political opinion that they were persecuted. Therefore, the BIA's conclusion that Tamils are not, as a general matter, persecuted in Sri Lanka is largely irrelevant.

In addition, the BIA found that the actions of the Sri Lankan authorities did not constitute persecution because they arrested the petitioners in order to investigate terrorist activity. However, while the government has the legitimate right to combat terrorism through the arrest and interrogation of suspected terrorists, this right does not include the beating and torture of the detainees. *See Balazoski v. INS,* 932 F.2d 638, 642 (7th Cir.1991); *Singh,* 801 F.Supp. at 319 & n. 3. Furthermore, the record discloses no evidence that an actual, legitimate criminal prosecution was ever initiated against either petitioner. Rather, it appears undeniable that the petitioners were arrested and abused because the authorities believed that the they were members or supporters of the LTTE and shared the LTTE's political beliefs, *i.e.,* Tamil separatism achieved through terrorist means.

---

2. The BIA did not expressly find that petitioners were persecuted at all, though it acknowledged that they suffered physical abuse at the hands of the authorities. We note that the torture and extended detention suffered by the petitioners

clearly satisfies the punishment element of "persecution." *See Sivaainkaran v. INS,* 972 F.2d 161, 164–65 & n. 2 (7th Cir.1992); *Singh v. Ilchert,* 801 F.Supp. 313, 319 & n. 3 (N.D.Cal. 1992).

We find that the BIA's apparent conclusion to the contrary is not supported by substantial evidence.[3] Each time the petitioners were arrested and beaten they were accused of membership in or support of the LTTE, or asked about the LTTE membership and activities. These facts alone clearly indicate that the petitioners were singled out because of suspected involvement in the LTTE, and that the authorities imputed the political opinion of the LTTE to petitioners. We find that no reasonable factfinder could fail to find that petitioners were persecuted on account of that imputed political opinion. *See INS v. Elias–Zacarias,* —— U.S. ——, ——, 112 S.Ct. 812, 817, 117 L.Ed.2d 38 (1992). Because the petitioners have demonstrated that they suffered past persecution within the meaning of 8 U.S.C. § 1101(a)(42)(A), they are statutorily eligible for asylum. *See Skalak v. INS,* 944 F.2d 364, 365 (7th Cir.1991). We therefore reverse the decision of the BIA denying petitioners' requests for asylum.

■ We now turn to the petitioners' applications for withholding of deportation. The BIA denied the requests, concluding that petitioners had failed to establish a clear probability of persecution in the event that they are returned to Sri Lanka. With respect to Arulanantham, we find that substantial evidence supports the BIA's decision, and therefore affirm its denial of Arulanantham's application for withholding of deportation. Although Arulanantham was arrested and abused on one extended occasion, he was immediately released when his mother offered evidence that he was a student. He was not subsequently arrested or abused, and the authorities provided no indication, through threats or otherwise, that they would harass or beat him in the future. The requirement that he check in at the police station, however inconvenient, simply does not support a claim of persecution. *See, e.g., Zalega v. INS,* 916 F.2d 1257, 1259–60 (7th Cir.1990) (repeated interrogations or incarcerations not accompanied by torture or threats does not constitute persecution). Indeed, for the short period of time that he complied with that requirement, he was not subject to harassment or abuse. We therefore find substantial evidence supporting the BIA's conclusion that Arulanantham failed to demonstrate a clear probability of persecution.

■ With respect to Rajaratnam, however, we reverse the BIA's denial of withholding of deportation. Rajaratnam has been repeatedly detained and tortured by the authorities in Sri Lanka. In his most recent series of encounters, he was required to sign in with the police on a regular basis. Each time he did so, he was questioned about his involvement with the LTTE and physically tortured. The frequency and severity of such actions make it more likely than not that they would continue if Rajaratnam were forced to return to Sri Lanka. *See Zacarias v. INS,* 921 F.2d 844, 852 (9th Cir.1990) (high frequency of persecution contributes to likelihood that such persecution would continue). Rajaratnam also testified that others who had been detained had disappeared, further supporting his claim of a clear probability of persecution. *Id.* (evidence that "other persons whom [the alien] knew were victims" of persecution supports "clear probability" claim). In sum, Rajaratnam has demonstrated that continued persecution is more likely than not if he is deported.[4] Further, as discussed above with

---

**3.** The BIA opinions in this case are not as clear as they might be. It appears that the BIA rejected the petitioners' claims of persecution on account of imputed political belief as a factual matter. To the extent, however, that the BIA is interpreting "political opinion" to not include erroneously imputed political opinion, we reject that construction of the statute as unreasonable. *See Desir v. Ilchert,* 840 F.2d 723, 728–29 (9th Cir.1988); *Opinion of the INS General Counsel,* 70 Interp. Releases 498 (Apr. 12, 1993).

**4.** Indeed, the immigration judge who heard Rajaratnam's application expressly found that

"[t]he Applicant has established a clear probability of persecution by the Sri Lanka government and the EPRLF if he were to return to Sri Lanka based upon his Tamil ethnicity and imputed political opinion." Decision of the Immigration Judge at 12 (Jan. 11, 1993). The immigration judge, however, denied Rajaratnam's application, finding that it could not be distinguished from the BIA's decision denying withholding of deportation in another case involving an alien from Sri Lanka, *Matter of T–,* Interim Decision 3187 (BIA 1992). However, the opinion in *Matter of T–* focuses on T–'s request for asylum and withholding of deportation based solely upon his

respect to his application for asylum, it is clear that this persecution is on account of the LTTE political opinion imputed to him by the authorities. Rajaratnam is therefore entitled to mandatory withholding of deportation. Because the BIA's conclusion to the contrary is not supported by substantial evidence, we reverse. *See Blanco–Lopez v. INS,* 858 F.2d 531 (9th Cir.1988) (reversing BIA denial of withholding of deportation under similar facts).

## IV. CONCLUSION

For the reasons set forth above, we reverse the decision of the BIA with respect to both petitioners' applications for asylum, and remand to the Attorney General to exercise her discretion. As regard the petitioners' application for withholding of deportation, we affirm the BIA with respect to Arulanantham, and reverse the BIA with respect to Rajaratnam. It is so ordered.

Tamil ethnicity and his political view generally supporting Tamil separatism. It did not deal with the claim that petitioner had been persecuted because of imputed *LTTE* political views, as is the case here. As a result, *Matter of T–* is inapposite.