

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-1-1998

# Balasubramanrim v. INS

Precedential or Non-Precedential:

Docket 97-3424

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Balasubramanrim v. INS" (1998). *1998 Decisions.* Paper 98.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/98

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 1, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-3424

ARAVINTHAN BALASUBRAMANRIM,
        Petitioner

v.

IMMIGRATION AND NATURALIZATION SERVICE,
        Respondent

On Petition for Review of an Order of the
Board of Immigration Appeals
(Board No. A73 489 747)

Argued March 10, 1998

Before: GREENBERG, SCIRICA and ALDISERT,
Circuit Judges

(Filed: May 1, 1998)

        VISUVANATHAN RUDRAKUMARAN,
        ESQUIRE (ARGUED)
        875 Avenue of the Americas,
         Suite 500
        New York, New York 10001

         Attorney for Petitioner

PAULINE TERRELONGE, ESQUIRE
  (ARGUED)
DAVID V. BERNAL, ESQUIRE
SUSIE CHO, ESQUIRE
CHRISTOPHER C. FULLER,
  ESQUIRE
MICHAEL P. LINDEMANN, ESQUIRE
MADELINE HENLEY, ESQUIRE
United States Department of Justice
Office of Immigration Litigation
Civil Division
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044

  Attorneys of Respondent

OPINION OF THE COURT

SCIRICA, Circuit Judge.

Aravinthan Balasubramanrim petitions for review of an order of the Board of Immigration Appeals denying his application for asylum and withholding of deportation. The Board, with one member dissenting, found Balasubramanrim's testimony before the immigration judge was not credible because it was inconsistent with information he gave to Immigration and Naturalization Service officials at the airport upon entry into the United States. Because this credibility finding was not supported by substantial evidence, we will grant the petition.

I.

Balasubramanrim, a Sri Lankan citizen of Tamil ethnicity, was born on February 19, 1969, in a province in the northern part of Sri Lanka. In support of his asylum and withholding of deportation application, he submitted substantial documentary evidence concerning recent political and social developments in Sri Lanka. This documentary evidence supports his claim that some Tamils in Sri Lanka are subject to mistreatment at the hands of both government and anti-government forces.

2

Since 1987, civil unrest has disrupted life in Sri Lanka. The conflict stems primarily from tensions between the minority Tamils and the majority Sinhalese.1 In an effort to establish an independent Tamil state in the north, the Liberation Tigers of Tamil Eelam have been in armed conflict with the government and Indian peacekeeping forces since 1987.2 Although the Liberation Tigers have succeeded in controlling much of the Northern Province and parts of the Eastern Province, not all Tamils support them. In fact, the Eelam People's Democratic Party, the People's Liberation Organization of Tamil Eelam and the Tamil Eelam Liberation Organization all cooperate with the government security forces.

Since the conflict erupted, both government forces and Liberation Tiger rebels have committed human rights violations. According to a 1995 report of the State Department's Bureau of Human Rights and Humanitarian Affairs, both sides mistreat prisoners and arrest suspected opponents on an arbitrary basis. Young male Tamils like Balasubramanrim are most often the target of this abuse. According to the State Department, most Sri Lankan asylum claimants in the United States are Tamil males between the ages of 20 and 36, and they generally allege mistreatment at the hands of the Sri Lankan authorities and the Liberation Tigers.

In his application for asylum, Balasubramanrim claims he was a victim of these abuses and that if he returns to Sri Lanka he will again be persecuted. Balasubramanrim claims to have been arrested, detained, and tortured on several occasions by the armed forces of the Sri Lankan government, the Indian peacekeeping forces, and the Liberation Tigers. Specifically, in his application,

_____

1. About 18% of Sri Lanka's population is Tamil while 74% is Sinhalese. The Tamils are predominantly Hindu while the Sinhalese are predominantly Buddhist.

2. In July 1987, the Government of Sri Lanka entered an agreement with the Government of India under which India stationed forces in Sri Lanka through March, 1990. Although initially the Indian forces were able to maintain a low level of violence, fighting broke out between the Indians and the Liberation Tigers in 1988 and 1989.

3

Balasubramanrim described the following events: (1) In March 1988, he was arrested by the Indian peacekeeping forces and taken to a camp where he was accused of being a "Tiger" and beaten; (2) in November 1989, he was again arrested (the administrative record is unclear on who arrested him) because he refused to join the ranks of one of the political fighting forces, was tortured for an entire day, and remained in custody for five days; (3) in March 1990, the Tigers arrested him for 10 days and accused him of being an informant for the Indian Peacekeeping Forces, a charge which he claims was untrue; (4) in 1991, his brother disappeared after being arrested by the Sri Lankan army; (5) in 1993, his father was killed by Sri Lankan air bombs; (6) in October 1993, he fled northern Sri Lanka but was arrested for failing to register in the new area; (7) also in October 1993, after accusing Balasubramanrim of being a Tiger, the Sri Lankan army arrested, detained, and tortured him for one year and ten days; eventually, his wife bribed the army for his release; (8) in late 1994, Sri Lankan armed forces arrested him at the airport as he was trying to leave the country with his family, and he was detained and tortured for four months and ten days.3

Shortly thereafter, Balasubramanrim left Sri Lanka by using a false Canadian passport. He went to Singapore, then Malaysia, then London, and finally to the United States. Balasubramanrim arrived at John F. Kennedy Airport on April 6, 1995. Upon arrival, INS officers interviewed him in English without a translator. The only record we have of this interview is a document consisting of 25 hand-printed questions and answers. We do not know how the interview was conducted or how the document was prepared. The transcript reads in part:

> (3)  Q. When and where were you born?
>      A. 2/19/69 Jaffna, Sri Lanka.
>
> (7)  Q. Why are you coming to the U.S. today?
>      A. today I am going to Toronto

_____

3. Balasubramanrim's wife and child successfully fled to Canada where they were given refugee status.

(13) Q. What was your occupation in Sri Lanka?
A. I owned a grocery market.

(14) Q. So if you owned a grocery market why are you going to Toronto?
A. I go for two months to visit my family and I go back to Sri Lanka. No I stay in Toronto.

(15) Q. Why will you stay in Toronto and not go back to Sri Lanka?
A. I go to jail if I go back to Sri Lanka – I have problems with LTT – Liberation Tigers of Tamil and Sri Lanka government an police and military because I have business problems and my brother plots against the government.

(17) Q. What would happen if you returned to Sr i Lanka?
A. The will kill me.

(18) Q. How did you get to the U.S. from Sri La nka?
A. I left Sri Lanka one month ago – first I went to Singapore for 15 days then to Malaysia for 14 days – then to London for 1 day – then to here.

(22) Q. Have you or anyone in your family ever been arrested?
A. my brother, military and police arrested him – for being with a group of people – I have never been arrested.

(25) Q. Is anything else you want to add to thi s statement?
A. I was arrested also, by LTT [Liberation Tige rs of Tamil Ealan], they kept me for 10 (Ten) days. After I gave them money they let me go –$12,000 Sri Lanka Rubies.

(errors reproduced). Balasubramanrim signed the transcript on each page and also signed under a declaration which the INS officials had written: "I have had the foregoing statement read to me in English and have understood and answered all the questions voluntarily, and I swear my statement is the truth." Id. at 193.

Subsequently, Balasubramanrim appeared before the

immigration judge. Consistent with his application for asylum and withholding of deportation, Balasubramanrim testified about numerous instances of mistreatment at the hands of the Sri Lankan government and the Liberation Tigers. But on August 29, 1995, the immigration judge found Balasubramanrim excludable,[4] denied his application for asylum and withholding of deportation, and ordered him deported to Sri Lanka. The immigration judge concluded that Balasubramanrim had not told the truth about his prior arrests and his fears about returning to Sri Lanka.[5] The immigration judge also expressed doubts about Balasubramanrim's credibility because he did not look at

_____

4. The Immigration Judge found Balasubramanrim excludable because he had no valid immigration visa, 8 U.S.C. SS 1182(a)(7)(A)(i)(I) (1994); was a nonimmigrant without a valid passport, 8 U.S.C. S 1182(a)(7)(B)(i)(I); and had no valid nonimmigrant visa or border crossing card, 8 U.S.C. S 1182(a)(7)(B)(i)(II). Balasubramanrim does not appeal these findings.

5. In questioning Balasubramanrim, the immigration judge said:

    Q: Sir, reading your affidavit, your affidavit question was have you
    or any of your family been arrested. You state my brother was
    arrested for being with a, can't read the word, but the -- what I'm
    getting at, the next sentence. I have never been arrested. You told
    the Immigration officers at the airport that you were never arrested?

    A: I told them that I have a brother who is in (indiscernible)
    arrested. He was arrested by the Army, police and PLAT.

    Q: Did you tell -- hello, did you tell the Immigration officers at the
    airport that you were never arrested, yes or no? Yes or no, sir? Yes
    or no?

    A: No.

    Q: So they just made this up?

    A: I told them I was not arrested in (indiscernible).

    Q: Did you tell the Immigration officers that you can't go back to
    Sri Lanka because you have business problems, and because of
    your brother's plots against the government, yes or no? Yes or no
    sir?

    A: If I have said anything, that means I did not understand.

him while testifying and instead stared straight ahead "as though in a trance." Balasubramanrim appealed. 6

The Board conducted an independent review of Balasubramanrim's credibility and upheld the judgment of the immigration judge. The Board did not put any stock in the immigration judge's reliance on Balasubramanrim's failure to make eye contact7 but nevertheless found him not credible and on July 10, 1997 dismissed his appeal. The Board was particularly troubled by what it saw as inconsistencies between Balasubramanrim's testimony at the hearing and his airport statement. As noted, one board member dissented.

II.

The Board had jurisdiction under 8 C.F.R. SS 3.1(b), 3.1(c) and 236.7 (1997). We have jurisdiction under 8 U.S.C. S 1105a, as amended by the transitional changes in judicial review set forth in S 309(c) of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) of 1996, Pub. L. No. 104-208, 110 Stat. 3009. On August 6, 1997, Balasubramanrim filed a timely petition for review as required by S 309(c).

Whether an asylum applicant has demonstrated a well-founded fear of persecution is a factual determination reviewed under the substantial evidence standard. Chang v. INS, 119 F.3d 1055, 1060 (3d Cir. 1997). We will uphold the agency's findings of fact to the extent they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992) (citing 8 U.S.C.

_____

6. While the appeal to the Board was pending, the INS agreed to parole Balasubramanrim to Canada, where his family resides, and Balasubramanrim withdrew his appeal. Later, according to Balasubramanrim, the INS changed its policy and would not parole him to Canada. Subsequently, the Board allowed him to reinstate his appeal.

7. Specifically, the Board stated: "the Immigration Judge's perception of the applicant's `body language' at the hearing is not a matter on which we place any significant weight, as such behavior is amenable to varying explanations."

S 1105a(a)(4)). Likewise, adverse credibility determinations are reviewed for substantial evidence. Hartooni v. INS, 21 F.3d 336, 340 (9th Cir. 1994); Cordero-Trejo v. INS, 40 F.3d 482, 487 (1st Cir. 1994).

III.

A.

Under the asylum statute, 8 U.S.C. S 1158 (1994), if the Attorney General determines that an alien is a refugee within the meaning of 8 U.S.C. S 1101(a)(42)(A) (1994), the Attorney General has the discretion of granting the alien asylum. A refugee is defined as:

> any person who is outside any country of such person's nationality ... and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. S 1101(a)(42)(A).8 Thus, Balasubramanrim has the burden to show that he qualifies as a refugee because he was persecuted in the past or has a "well-founded fear" of future persecution on the ground of, inter alia, political opinion, which is the basis of his appeal.

B.

Where the immigration judge makes a credibility determination, the Board can independently assess that

_____

8. In addition, Balasubramanrim applied for withholding of deportation. Section 243(h) of the Immigration and Nationality Act, 8 U.S.C. S 1253(h) (1994), requires withholding of deportation of an alien "if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." Eligibility for withholding
of deportation under section 243(h) of the INA involves a stricter standard ("clear probability") than eligibility for asylum. See INS v. Cardoza-Fonseca, 480 U.S. 421, 430-31 (1987).

determination and make de novo findings on credibility. See Damaize–Job v. INS, 787 F.2d 1332, 1338 (9th Cir. 1986) ("The Board has the power to review the record de novo and make its own findings of fact, including credibility determinations."). In this case, the Board conducted such an assessment and found Balasubramanrim not credible. As noted, we review the Board's adverse credibility determination for substantial evidence. Hartooni, 21 F.3d at 340. "The Board's findings ... must ... be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." Universal Camera Corp. v. NLRB, 340 U.S. 474, 490 (1951). Though we defer to reasonable inferences drawn by the Board from conflicting evidence, "deference is not due where findings and conclusions are based on inferences or presumptions that are not reasonably grounded in the record, viewed as a whole." Cordero–Trejo, 40 F.3d at 487 (citations omitted).

The Board should give specific reasons for its determination that a witness is not credible. Mosa v. Rogers, 89 F.3d 601, 604 (9th Cir. 1996). We must "evaluate those reasons to determine whether they are valid grounds upon which to base a finding that the applicant is not credible." Id. (citations omitted). The reasons must bear a legitimate nexus to the finding. Id. (citations omitted).

In concluding that Balasubramanrim was not credible, the Board focused on perceived inconsistencies between information Balasubramanrim gave to INS officers at the airport and his testimony before the immigration judge. Although there are some inconsistencies, we do not believe that the airport statement in this case provides a valid ground upon which the Board could base its finding that Balasubramanrim was not credible.

The INS officers interrogated Balasubramanrim at the airport. As noted, the only record we have of this interview is a document consisting of 25 hand–printed questions and answers.

The document includes the following:

(22) Q: Have you or anyone in your family been arrested?
A: My brother, military and police arrested him-- for being with a group of people--I have never been arrested.

* * *

(25) Q: Is there anything else you want to add to this statement?
A: I was arrested also, by LTT, they kept me for 10 (ten) days. After I gave them money they let me go--$12,000 Sri Lanka Rubies.

After comparing this statement to the testimony Balasubramanrim gave before the immigration judge, the Board stated: "The applicant's airport statement is not consistent with his story of serious mistreatment by the Sri Lankan military over a prolonged period." The Board questioned why, if Balasubramanrim had actually been mistreated on multiple occasions, he did not relate all these incidents to the INS officers at the airport.

Yet an examination of the record reveals that Balasubramanrim's airport interview may not represent an accurate account of the persecution he suffered in Sri Lanka. If this is so, then, under the fact of this case, the Board placed undue reliance on the airport interview.

The following factors are relevant. First, the hand written record of the airport interview in this case may not be reliable. We do not know how the interview was conducted or how the document was prepared. We do not know whether the questions and answers were recorded verbatim, summarized, or paraphrased. We cannot tell from the document the extent to which Balasubramanrim had difficulty comprehending the questions, whether questions had to be repeated, or when and how sign language was used. Nor does the document reveal whether Balasubramanrim's responses actually correspond to those recorded or whether the examiner recorded some distilled or summary version based on his best estimation of the response.

Second, the airport statement is not an application for asylum. The questions posed were not designed to elicit the

details of an asylum claim, and it appears the airport examiner in this case had no interest in developing the details of a potential asylum claim. For example, at one point, the following exchange took place:

> (17) Q. What would happen if you returned to Sri Lanka?
> A. The (sic) will kill me.

But remarkably there was no follow up question. The examiner did not inquire who would kill Balasubramanrim or why. The next question was: "How did you get to the U.S. from Sri Lanka?" In addition, the airport statement itself contains inconsistent responses that the INS examiner did not clarify. For example, the examiner asked Balasubramanrim if he had ever been arrested, and, according to the handwritten document, he said that he hadn't. Later, in response to another question, Balasubramanrim told the INS officers: "I was also arrested by the LTT, they kept me for 10 days, after I gave them money, they let me go." But this apparent inconsistency was never explored. Nor was Balasubramanrim's use of the word "also", which might imply there was more than one arrest.[9]

Third, an arriving alien who has suffered abuse during interrogation sessions by government officials in his home country may be reluctant to reveal such information during the first meeting with government officials in this country. Similarly, when the arriving alien is not proficient in English and no translator is provided, the airport interview may not elicit all the events which are central to an asylum claim.

Our recent case, Marincas v. Lewis, 92 F.3d 195 (3d Cir. 1996), is instructive. In Marincas, we found the asylum

---

9. Unfortunately, Balasubramanrim's attempt to explain the lack of arrest information in the airport statement is marked "indiscernible" in the asylum hearing transcript. When the immigration judge questioned Balasubramanrim concerning his statement that he had never been arrested or detained and that he was in trouble because of his brother's activities, he responded: "I told them that I was not arrested in (indiscernible)." We are left guessing as to this critical aspect of the credibility determination in this case.

11

procedure afforded stowaways inadequate because there was no translator and no mechanism to ensure accurate recording of their statements to assure a fair review process. Id. at 204. Balasubramanrim, unlike the stowaways in Marincas, received a full adversarial hearing before an immigration judge and had the assistance of an attorney at that hearing. But in carefully scrutinizing Balasubramanrim's initial statements at the airport, the Board treated that interview like an initial application for asylum. Furthermore, the airport statement procedure here suffers from some of the same defects as did the stowaway proceedings invalidated in Marincas. Balasubramanrim did not have a translator at the airport interview. Nor do we have any confidence that the interview was accurately recorded. At least in Marincas the stowaways were informed that they were being afforded the opportunity to present their claim for asylum and were questioned specifically as to their past persecution or well-founded fear of future persecution. No such notice was provided in this case.

Finally, we are not confident the Board made an accurate assessment of Balasubramanrim's English skills. In reaching its credibility determination, the Board relied heavily on its conclusion that Balasubramanrim knew a "fair amount of English" at the time of the airport interview. Yet looking at the record, it is difficult to see the basis for this conclusion.

Balasubramanrim maintains that he knew very little English at the time of the airport interview and that this accounts in large part for his failure to tell the INS officers about his mistreatment in Sri Lanka. When the immigration judge asked Balasubramanrim what he said when questioned at the airport, Balasubramanrim responded, "I don't understand what they ask me." When asked whether he understood the airport statement that he signed and whether an oath was administered before he signed it, Balasubramanrim replied: "I don't understand English, so I don't know." Finally, when the immigration judge asked him about the airport statement, Balasubramanrim replied: "I don't understand that much of English. So what I do understand, I said yes. Whatever I didn't understand, I said no. But most of the time it was

12

like sign language. So they were asking me in sign, so I was signing back."

The Board dismissed this argument, noting that Balasubramanrim was able to convey a great deal of accurate information. The Board concluded:

> [A]s the applicant was able to communicate [information about dates and places he had been] accurately, and was able to communicate his brother's detention by the LIBERATION TIGERS of 10 days, we do not find that the immigration judge erred in concluding that the applicant should also have been able to communicate his other, more significant, detentions he claimed at the hearing; i.e. his detention for 1 year and 10 days, and another 4 months by the Sri Lankan Armed Forces.

The Board also found that at his hearing, Balasubramanrim on several occasions answered questions posed to him in English without waiting for the translation. Balasubramanrim maintains that during his four months of detention he was able to improve his English language skills through conversation with English-speaking cellmates.

The Board made this finding without any support in the record that Balasubramanrim knew English prior to his arrival in the United States. We agree with the dissenting board member who criticized "the majority's linguistic analysis" and concluded: "the majority's estimation of the applicant's proficiency in English is based on their observation that the applicant responded in English to some questions at the immigration hearing. An examination of the transcript reveals that such occasions were so few, so incidental, and involved such elemental English that they provide an insufficient basis for evaluating the applicant's level of English proficiency."

Moreover, we note that the information Balasubramanrim indicates was accurately recorded at the airport interview consists of fairly straightforward questions, involving one word or short answers that would have been relatively easy to understand or communicate. For example, he gave his name, other names he may have used, when and where he

13

was born, what country he was a citizen of, etc. As the dissenting board member noted, "These questions involved common words and called for fairly direct answers. It is reasonable that the applicant would know numbers, and dates, and days and not be able to express more complicated situations such as the reasons he feared persecution or his various experiences of torture and detention."

That there were some inconsistencies between the airport statement and Balasubramanrim's testimony before the immigration judge is not sufficient, standing alone, to support the Board's finding that Balasubramanrim was not credible. See Aguilera-Cota v. INS, 914 F.2d 1375, 1382 (9th Cir. 1990) (finding that inconsistencies between an applicant's written asylum application and his testimony at the asylum hearing are not enough, standing alone, to serve as a basis for finding a lack of credibility). We find that the Board's credibility determination was not reasonable because the airport interview alone in this case does not serve as a "valid ground[ ] upon which to base a finding that an asylum applicant is not credible." Id. (citations omitted).

C.

Balasubramanrim applied for asylum and withholding of deportation. As noted, under 8 U.S.C. S 1158, if the Attorney General determines that an alien is a refugee within the meaning of 8 U.S.C. S 1101(a)(42)(A), then the Attorney General has the discretion to grant the alien asylum. A refugee is eligible for asylum if he was persecuted in the past or has a "well-founded fear" of future persecution on the ground of, inter alia, political opinion, which is the basis of the Balasubramanrim's appeal. 10 Id. In

_____

10. The persecution may be on account of a political opinion the applicant actually holds or on account of one the foreign government has imputed to him. Sangha v. INS, 103 F.3d 1482, 1489 (9th Cir. 1997). See also Cruz-Diaz v. INS, 86 F.3d 330, 332 (4th Cir. 1996) (rejecting applicant's asylum claim because "the evidence does not compel the conclusion that Cruz-Diaz will be subjected to persecution or other harm based on actual or imputed political opinion"); Singh v. Ilchert, 63 F.3d

14

addition, 8 U.S.C. S 1253(h) requires withholding of deportation of an alien "if the Attorney General determines that such alien's life would be threatened on account of ... political opinion." Eligibility for withholding of deportation involves a stricter standard ("clear probability") than eligibility for asylum. See INS v. Cardoza-Fonseca, 480 U.S. 421, 430-31 (1987). The well-founded fear standard has a subjective and an objective component. Id. at 430-31. The alien must show that "he has a subjective fear of persecution that is supported by objective evidence that persecution is a reasonable possibility." Chang, 119 F.3d at 1066. When documentary evidence is lacking, as in the instant case, the applicant's credible, persuasive, and specific testimony may suffice. Aguilera-Cota v. INS, 914 F.2d 1375, 1378 (9th Cir. 1990).

Because the Board found Balasubramanrim not credible, it rejected his application for asylum and withholding of deportation without conducting further analysis of his claim. "In the absence of substantial evidence supporting a finding of adverse credibility, the BIA is required explicitly to consider a petitioner's claims for asylum and withholding of deportation." Mosa, 89 F.3d at 605 (citations omitted). We will grant the petition and remand to the Board, with leave to further remand to the immigration judge, for a determination of Balasubramanrim's claims for asylum and withholding of deportation without reliance on the adverse credibility finding. In reaching this conclusion, we do not purport to comment on the credibility of the assertions in Balasubramanrim's petition. We hold only that, because of ambiguities in the airport statement and the circumstances under which it was made, that statement does not provide

_____

1501, 1509 (9th Cir. 1995) (relying on evidence that the applicant was tortured because he was suspected of being a Sikh separatist); Ravindran v. INS, 976 F.2d 754, 760 (1st Cir. 1992) (citation omitted) ("An imputed political opinion, whether correctly or incorrectly attributed, may constitute a reason for political persecution within the meaning of the Act."); Rajaratnam v. Moyer, 832 F. Supp. 1219, 1223 (N.D. Ill. 1993) (finding eligibility for asylum based on evidence that applicant was persecuted because the authorities suspected him of being a member of the Liberation Tigers).

15

sufficient evidence to support the adverse credibility determinations upon which the immigration judge and BIA denied the petition.

IV.

For the foregoing reasons, we conclude that substantial evidence did not support the Board's findings. Accordingly, we will grant the petition and remand for proceedings consistent with this opinion.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

16