

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-15-2004

# Ocampo-Montes v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-4144

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Ocampo-Montes v. Atty Gen USA" (2004). *2004 Decisions.* Paper 135.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/135

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 03-4144

SARA OCAMPO-MONTES,

Petitioner

v.

JOHN ASHCROFT, ATTORNEY
GENERAL OF THE UNITED STATES,

Respondent

On Petition for Review of a Final Order
of the Board of Immigration Appeals
(No. A79-101-929)

Submitted Under Third Circuit LAR 34.1(a)
October 28, 2004

Before: NYGAARD, AMBRO, and GARTH, Circuit Judges

(Opinion filed November 15, 2004)

OPINION

AMBRO, Circuit Judge

Petitioner Sara Ocampo-Montes ("Ocampo") seeks review of an order of the

Board of Immigration Appeals ("BIA"). That order affirmed the decision of the

Immigration Judge ("IJ") denying Ocampo's applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). We have jurisdiction under 8 U.S.C. § 1252 and deny the Petition for Review.

## I. **Factual and Procedural History**

Ocampo is a native and citizen of Colombia. She has two daughters who reside in Norwalk, Connecticut, one of whom is a United States citizen. In March 2001, Ocampo attempted to enter the United States without possessing valid entry documentation, and an immigration inspector determined that Ocampo was inadmissible. She sought asylum and, several days after her arrival, an asylum officer interviewed her. The asylum officer determined that Ocampo had a credible fear of persecution.

In April 2001, the Immigration and Naturalization Service ("INS")[1] charged Ocampo with removability on the ground that she did not possess valid entry documentation. In removal proceedings, Ocampo admitted the factual allegations of the charges. Ocampo, however, requested asylum, withholding of removal, and protection under CAT.

In April 2002, Ocampo appeared before the IJ for an individual hearing. Because we write solely for the benefit of the parties, only a summary of Ocampo's testimony before the IJ is necessary. She testified that she fears returning to Colombia, as she

---

[1]On March 1, 2003, the INS ceased to exist as an agency within the Department of Justice and the INS's functions were transferred to the Department of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, §§ 441, 451 & 471, 116 Stat. 2135.

believes she will again be targeted by guerrillas in retaliation for her political activities. In 1997, Ocampo worked on the successful mayoral campaign of Ricardo Cobo in Cali, the city in which Ocampo then resided. In 1999, she participated in demonstrations against guerrillas and collected signatures for petitions urging the government not to negotiate with guerrillas who had kidnapped large numbers of people. Following a demonstration in June 1999, she expressed her opposition to guerrilla forces by hanging a banner that read "No More" in front of her home.

After this followed events that caused Ocampo to believe she was being threatened by guerrillas, specifically the National Liberation Army (or ELN), which is one of Colombia's significant guerilla groups known to have committed a host of human rights violations. For example, dead birds and frogs were thrown around her home, her garden and home were vandalized, her two cats died apparently from poisoning, and her daughter was followed by a suspicious man. Additionally, beginning in 2000, Ocampo received approximately ten telephone calls late at night or early in the morning from an unidentified caller. During several of the telephone calls the caller referred to death or killing. On two occasions, Ocampo sought police protection without avail.

Although Ocampo was at least initially uncertain about who instigated these incidents, she began suspecting members of a guerrilla organization. This was corroborated by Ocampo's daughter, Claudia, who testified that Ocampo had been politically active and that "strange things" began happening after Ocampo hung the "No

3

More" banner in front of the family home.

At the conclusion of the hearing, the IJ issued an oral decision denying the applications for asylum, withholding of removal, and protection under CAT. Among other things, the IJ found that Ocampo was not credible and that she had not established eligibility for asylum.

In support of his finding that Ocampo was not credible, the IJ emphasized two "major" inconsistencies. First, in her airport statement to the immigration inspector, Ocampo stated that she had left Colombia as a result of telephone calls she received and because a group of persons that she believed to belong to a guerilla organization had sent her letters in support of their cause. At the hearing, however, the only note Ocampo referred to was the one she found around the time her cats died, and she did not refer to any other notes or writings from any guerilla groups. Thus, the reference in the airport statement suggests Ocampo had left Colombia because guerrillas were soliciting her support, rather than because they had threatened her and her daughters in retaliation for their anti-guerrilla activities. Second, in testimony before the IJ, Ocampo stated that her younger sister had been kidnapped by guerrillas. No mention of the kidnapping appears in the airport statement, credible fear interview summary, or asylum application.

Regarding Ocampo's failure to meet her burden of proof, the IJ explained that Ocampo had not shown, among other things, that the guerrillas were responsible for the vandalism or threats. The link between the vandalism and Ocampo's political

4

involvement, the IJ found, was attenuated at best. Moreover, the IJ was troubled by the lack of corroborating evidence (other than the testimony of Ocampo's daughter) that showed Ocampo was an activist. The IJ also questioned, among other things, whether the alleged threats even rose to the level of persecution, as opposed to mere harassment. Finally, the IJ concluded that Ocampo could relocate to another part of Colombia to avoid persecution.

## II. Discussion

Where, as here, the BIA affirms the IJ's decision without opinion, the opinion of the IJ constitutes the final agency determination for purposes of our review. 8 C.F.R. § 1003.1(e)(4) (2003); *Dia v. Ashcroft*, 353 F.3d 228, 243 (3d Cir. 2003) (en banc). Whether an asylum applicant has demonstrated past persecution or a well-founded fear of future persecution is a factual determination reviewed under the substantial evidence standard. *Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002). Under this standard, the decision of the BIA may be reversed "only if the evidence presented by [the applicant] was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). In other words, "the BIA's finding must be upheld unless the evidence not only supports a contrary conclusion, but compels it." *Abdille v. Ashcroft*, 242 F.3d 477, 483-84 (3d Cir. 2001).

The Attorney General may grant asylum to an alien who demonstrates that she is unable or unwilling to return to her native land because of a "well-founded fear" of

5

persecution. *Abdille*, 242 F.3d at 482. A "well-founded fear" must be both subjectively genuine and objectively reasonable. *Zubeda v. Ashcroft*, 333 F.3d 463, 469 (3d Cir. 2003).

Ocampo argues that the IJ's adverse credibility finding was unwarranted, primarily because he relied too heavily on the airport statement. Ocampo correctly points out that we have cautioned against placing too much emphasis on an airport statement, particularly where that statement may not be reliable. *See Balasubramanrim v. INS*, 143 F.3d 157, 162-64 (3d. Cir. 1998). Her argument is misplaced, however, because the IJ did not rely solely on the airport statement in making his adverse credibility determination. *See id*. at 164 (explaining that some inconsistencies between the airport statement and a petitioner's testimony before the immigration judge are "not sufficient, standing alone," to support an adverse credibility finding). Here, the IJ's credibility determination also rested on Ocampo's failure to mention that her sister had been kidnapped, despite the fact that the asylum application included a question that directed Ocampo to identify mistreatment of family members. In view of the inconsistencies between the airport statement and the failure even to mention her sister's kidnapping, we cannot say that no reasonable factfinder could fail to find Ocampo credible. *Elias-Zacarias*, 502 U.S. at 483-84. For these reasons, substantial evidence supports the IJ's adverse credibility finding.

### III. Conclusion

We conclude, after reviewing the record as a whole, that it does not compel a contrary conclusion to that of the IJ. Withholding of removal was also properly denied. *See Lukwago*, 329 F.3d at 182 ("If [a petitioner] is unable to satisfy the standard for asylum, he necessarily fails to meet the standard for withholding of removal under [the INA].") In this context, we need not consider whether the IJ erred in alternatively finding that Ocampo's relocation elsewhere in Colombia would be reasonable.[2]

Accordingly, we will deny the Petition for Review.

---

[2]On appeal, Ocampo does not challenge the IJ's denial of relief under CAT. In any event, under the relevant regulations, "torture" means "severe pain or suffering" inflicted "at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. 208.18(a)(1). Ocampo does not allege that the Colombian government, public official, or other person acting in an official capacity has acquiesced to the guerrillas.