

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-2-2005

# Mwangi v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-3449

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Mwangi v. Atty Gen USA" (2005). *2005 Decisions*. Paper 278.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/278

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

IN THE UNITED STATES COURT
OF APPEALS
FOR THE THIRD CIRCUIT

———————

NO. 04-3449

———————

PATRICK GITAU MWANGI & riders; LEAH MWANGI;
ANNCILETA GITAU; KEVIN GITAU; IVINE GITAU,
Petitioners

v.

ATTORNEY GENERAL OF THE UNITED STATES;
DEPARTMENT OF HOMELAND SECURITY;
U.S. CITIZENSHIP & IMMIGRATION SERVICES,
Respondents

———————

On Petition for Review of an Order of the Board Of Immigration Appeals
No. A78-498-102

———————

Submitted Pursuant to Third Circuit LAR 34.1(a)
October 19, 2005

BEFORE:  SMITH, STAPLETON and NYGAARD, Circuit Judges

(Opinion Filed November 2, 2005)

———————

OPINION OF THE COURT

———————

STAPLETON, Circuit Judge:

Petitioners Patrick Gitau Mwangi ("Mwangi"), his wife, Leah, and three children, Annicileta Gitau, Kevin Gitau, and Ivine Gitua[1] petition for review of a decision of the Board of Immigration Appeals ("BIA") affirming an immigration judge's ("IJ's") decision denying their applications for asylum, withholding of removal, and protection pursuant to the Convention Against Torture ("CAT"),[2] as well as finding those applications to be frivolously filed. Mwangi and his family are natives and citizens of Kenya.

The IJ's primary basis for denying Mwangi's application and for finding it to be frivolous was an adverse credibility determination. The IJ did not believe Mwangi's testimony regarding his past persecution in Kenya or his fear of future persecution. In reviewing that determination, we start by reviewing Mwangi's testimony from the merits hearing.

Mwangi testified that he had been involved in politics since the early 1980s. He testified that he had been the Organizing Secretary for the Democratic Party ("DP"), an

---

[1]The cases of Mwangi's family members have all either been consolidated with or are derivative of Mwangi's application. As the parties have done, we will refer only to Mwangi as the petitioner.

[2]United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85, implemented in the United States by the Foreign Affairs Reform and Restructuring Act of 1998, Pub.L. No. 105-277, § 2242, 112 Stat. 2681-761 (codified at 8 U.S.C. § 1231).

opposition political party. Mwangi first testified that he joined the DP in 1979, but later stated that he joined in 1997.

On cross-examination, Mwangi testified that he joined the Forum for the Restoration of Democracy ("FORD") in the 1980s. He then testified that FORD was formed in either 1989 or 1990 and that he joined it in 1991. He later stated that he joined FORD in 1992, and then that he was unsure of the date and that it was between 1991 and 1992.

Mwangi testified to a number of incidents of alleged persecution. When walking home from school in 1982 on the day after a military coup, he was stopped by soldiers. The soldiers emptied his luggage and searched its contents. In 1990, he and his brother were arrested by "special branch people" for "[g]etting involved in politics." A.R. at 164. He was generally "roughly handled" by the police, but released the following day. Id. at 167. The police later pressured Mwangi's employer to fire him and Mwangi was fired as a result. The bank reinstated Mwangi three months later with back pay and transferred him to Nairobi.

Mwangi further testified that he "used to get beaten very often" when he was campaigning for a friend in 1992. Id. at 160. He was beaten by "K[ANU] Youth Wingers" and the police. Id. at 161. The Kenya Africa National Union ("KANU") was

3

the then-ruling political party in Kenya.[3]  Mwangi testified that at political gatherings they "just start beating people for no good reason" and that "they had clubs, a very big club." Id. at 162.

Mwangi testified that in 1995 on a trip from Nairobi to Nakuru he was arrested by KANU "youth wingers." Id. at 172-73.  They searched his luggage and detained him until the following day.

Mwangi testified that in 1997 he arranged transportation for a friend running for elective office.  He testified that he and others were arrested, detained for two days, interrogated, ordered to stop campaigning, and kicked and beaten.   Mwangi testified that he lost a tooth as a result.

On Mwangi's final trip to Kenya, according to his testimony, he was visiting his brother when his brother's house was attacked and burned down.  Mwangi testified that from talking to others he learned that this was done by KANU supporters.  The following day his own home was destroyed, along with a total of 25-30 homes in his neighborhood.

Finally, Mwangi testified that the KANU government and its supporters have been responsible for the murder or rape of a number of his extended family members.  In addition, Mwangi testified that his father's business was bulldozed by government workers with police protection.

_____

[3]We take judicial notice that the KANU party is no longer the governing party in Kenya.

Mwangi first entered the United States in July 1999. He testified, "I was escaping the persecution and I was attending a wedding of my. . . brother-in-law." Id. at 201. Mwangi's two daughters accompanied him to the United States.

According to Mwangi, his wife was "constantly harassed" while he was in the United States. Id. at 222. "[T]he K[ANU] youth wingers used very often to come over at night, force her to open the door, force her on the floor." Id. His wife had told him about this harassment before October 1999.

Mwangi sent his daughters back to Kenya in October 1999. He testified that "[i]t was safe for them [to return to Kenya], but not yet for" him. Id. at 218. He testified that he felt comfortable sending his children back to Kenya despite his knowledge of his wife's harassment because "[t]hey usually don't harm children." Id. at 225.

Mwangi returned to Kenya in January 2000. When asked why he returned home despite having previously fled to avoid persecution, he responded:

> I felt very strongly for my wife who had just delivered our son, and they were in constant harassment from the. . . youth wingers, and I felt they needed my reassurance. And, and as I was trying to get them documents to be able to, to leave the country, too. . . .

Id. at 201-02.

Upon his return, according to his testimony, Mwangi remained fearful of persecution. When he left his home he disguised himself by "getting dressed like a woman, putting on religious. . . clothes." Id. at 203. Upon further questioning, he testified that he disguised himself only "[a] couple of times." Id. at 204. He insisted,

5

however, that

> it reached a point that even my friends were telling me now. . . you're putting us in danger trying to accommodate you, and you have an option where you can go and stay safely. . . so I had to leave. And by then I had not been able to get traveling documents for my wife.

Id. at 205.

Mwangi returned to the United States, alone, in March 2000. Mwangi testified that despite being told by friends that "[p]eople are being arrested, arrested or being killed," id. at 206, and that his "uncle had just been killed and then the two daughters raped," id., he returned to Kenya in September 2000. He testified that he stayed in Kenya for two weeks, "trying to get traveling documents for [his wife] but it was proven real hard for to get them." Id. at 207. He returned again to the United States later that month because "it was not safe to stay back over there." Id.

Mwangi remained in the United States for six months. During that time, his wife successfully obtained a passport and a visa, and she joined her husband in the United States in January 2001. However, Mwangi testified that his children's traveling papers were with his own passport and so they could not travel to the United States with his wife.

Mwangi returned to Kenya again in March 2001 "[t]o go and get my children out." Id. at 210. He returned to the United States three weeks later with his children. Upon his arrival at the Philadelphia airport, he was interviewed by an immigration official. Mwangi told the official that he was visiting his "sister-in-law who had had problems." Id. at 212. He testified that he did not tell the official that he feared persecution because

6

he thought the answer he gave was "simpler." Id. When officials told him they wanted to return him to Kenya on the same flight he told them, "I have fear of going back home." Id. at 213.

The INS placed Mwangi and his family in removal proceedings. They all conceded removability, but sought asylum, withholding of removal, and protection under the CAT. Following the merits hearing, the IJ issued a decision denying Mwangi's application for asylum, withholding of removal, CAT protection and voluntary departure, and ordered Mwangi and his family returned to Kenya. The IJ concluded that Mwangi,

> fully cognizant of what transpires in Kenya, has fabricated his testimony to coincide with the political atmosphere in his country and has custom-made his testimony to fit in with the political situation in his country, to be afforded relief from this Court. The Court finds that the respondents have filed frivolous applications for asylum.

Id. at 72. The BIA affirmed the IJ's decision without opinion.

## A. Denial of the Applications

When the BIA issues an affirmance without opinion, we review the IJ's opinion. Smriko v. Ashcroft, 387 F.3d 279, 282 (3d Cir. 2004). We review the IJ's findings of fact for substantial evidence and ask whether a reasonable fact finder could make the finding on the basis of the administrative record. Dia v. Ashcroft, 353 F.3d 228, 249 (3d Cir. 2003); see also 8 U.S.C. § 1252(b)(4)(B) ("the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary"). An agency finding regarding credibility is a factual determination reviewed

7

according to the substantial evidence standard, as is a finding regarding a "well-founded fear of prosecution." Dia, 353 F.3d at 249; Abdille v. Ashcroft, 242 F.3d 477, 483 (3d Cir. 2001). An IJ must support her adverse credibility findings with specific, cogent, reasons. Id.

"[T]o be eligible for asylum in the United States as a refugee, an alien must demonstrate 'persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" Abdille, 242 F.3d at 492 (quoting 8 U.S.C. § 1101(a)(42)(A)). "The well-founded fear standard has a subjective and an objective component. The alien must show that 'he has a subjective fear of persecution that is supported by objective evidence that persecution is a reasonable possibility." Balasubramanrim v. I.N.S., 143 F.3d 157, 165 (3d Cir. 1998) (citation omitted). Similarly, to be eligible for "withholding of removal" an alien must demonstrate that it is "more likely than not" that he will be persecuted upon returning to his home country. I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 423 (1987). The "more likely than not" standard for withholding of removal is more stringent than the "well-founded fear" standard required for asylum. Janusiak v. INS, 947 F.2d 46, 47 (3d Cir. 1991). "An alien's credibility, by itself, may satisfy his burden, or doom his claim." Dia v. Ashcroft, 353 F.3d 228, 247 (3d Cir. 2003).

In making his adverse credibility determination, the IJ identified the following inconsistencies and implausibilities in Mwangi's testimony:

8

- Mwangi testified that he sent his two daughters back to Kenya in October 1999 even though he testified that his wife had told him that she was being violently harassed and that it was unsafe for Mwangi to return.

- Mwangi returned to Kenya four times even though he testified that he feared for his safety.

- Mwangi failed to apply for asylum in the course of any of his previous three visits to the United States.

- Mwangi changed his testimony regarding the year in which he joined the DP, first saying 1979 and later saying 1997.

- Mwangi similarly had difficulty recalling the year he joined FORD.

- Mwangi also had difficulty remembering the precise date when he was arrested and interrogated by the "youth wingers."

- Mwangi made no mention in his asylum application of the arrests and beatings he suffered at the hands of the police that he testified to during the hearing.

- Mwangi failed to otherwise substantiate with evidence his assertions: 1) that the KANU party was responsible for the burning of Mwangi's and his brother's homes; 2) that members of the KANU party were responsible for the killing of Mwangi's family and friends; and 3) that he was a member of any of the organizations in which he claimed membership.

Mwangi argues in response that: 1) Mwangi was not required to provide specific

9

documentary evidence that the threats and violence came at the hands of the ruling political party and its supporters; 2) Mwangi's error in misstating the date he joined DP is not a sufficient basis for an adverse credibility finding; 3) Mwangi's inability to remember the precise date when he was arrested and interrogated by the youth wingers is not an adequate basis for an adverse credibility finding; 4) the fact that Mwangi's testimony was not entirely consistent with his asylum application is not a sufficient basis for an adverse credibility finding; and 5) Mwangi offered a plausible explanation for his returns to Kenya in that he was afraid of overstaying his permissible time in the United States and that he was seeking ways to arrange travel for his wife and children.

The IJ identified "specific, cogent" reasons supported by the record for his adverse credibility determination. Taken as a whole, a reasonable fact finder could conclude based on those implausibilities and inconsistencies that Mwangi lacked credibility. Consequently, Mwangi failed to carry his burden of showing past persecution or a well-founded fear of future persecution.

### B. The Finding of Frivolousness

Mwangi also seeks review of the IJ's finding that Mwangi filed a frivolous application for asylum. Section 1158(d) of title 8 provides:

> If the Attorney General determines that an alien has knowingly made a frivolous application for asylum and the alien has received the notice under paragraph (4)(A), the alien shall be permanently ineligible for any benefits under this chapter. . . .

8 U.S.C. § 1158(d). Because of the "severe consequences" that attach to a frivolousness

10

finding, Muhanna v. Gonzales, 399 F.3d 582, 588 (3d Cir. 2005), the implementing regulations require that an IJ "specifically find[] that the alien knowingly filed a frivolous asylum application" in order for the provisions of § 1158(d) to apply. 8 C.F.R. § 208.20. "[A]n asylum application is frivolous if any of its material elements is deliberately fabricated." Id. An adverse credibility determination alone, however, is not sufficient to support a finding of frivolousness. As this Court explained in Muhanna:

> [U]nder 8 C.F.R. § 208.20 a finding of frivolousness does not flow automatically from an adverse credibility determination. . . . Inconsistencies between testimony and an asylum application, while certainly relevant to a credibility determination that may result in the denial of an applicant's asylum claim, do not equate to a frivolousness finding under Section 1158(d)(6), which carries with it much greater consequences. It is because of those severe consequences that the regulation requires more: a finding of deliberate fabrication of a "material element" of an application, plus an opportunity for the alien to account for inconsistencies.

399 F.3d at 589. We refused to accept a frivolousness finding in Muhanna based in part on the fact that it was "based not on a thorough examination of the [asylum] application but instead on [the IJ's] assessment of Muhanna's credibility" when testifying.

Here, the IJ did not "specifically find[]" that Mwangi "knowingly filed a frivolous asylum application." 8 C.F.R. 208.20. The relevant findings of the IJ were as follows:

> The Court doubts that any of the respondents' testimony concerning problems in Kenya is true. The Court believes that the respondents have fabricated their testimony in order to obtain a benefit from this Court. It is doubtless from the State Department reports that politics in Kenya is, at times, tumultuous and that the government of Kenya does harass opposition candidates and opposition political parties. The Court believes that the respondent, fully cognizant of what transpires in Kenya, has fabricated his testimony to coincide with the political atmosphere in his country and has

11

custom-made his testimony to fit in with the political situation in his country, to be afforded relief from this Court. The Court finds that the respondents have filed frivolous applications for asylum.

App. at 72.

The IJ clearly did not believe much of Mwangi's testimony regarding his past persecution and fear of future persecution, but the IJ failed to identify which, if any, of the material elements of Mwangi's asylum application Mwangi deliberately fabricated. Specifically, the IJ did not find that at the time Mwangi filed his application for asylum, Mwangi knew that a material aspect of his claim was fabricated. Because the IJ failed to comply with the requirements of 8 U.S.C. § 1158(d) and 8 C.F.R. § 208.20, we must conclude that substantial evidence does not support the frivolousness finding.

## C. Conclusion

We will grant the petition for review with respect to the finding of "frivolous applications" and will remand this matter to the BIA with instructions to vacate that finding and, if the matter is to be pursued, to provide petitioners a full and fair hearing with respect to specifically identified portions of the applications. We will deny the petition in all other respects.