**Kote JISHIASHVILI, Petitioner**

**v.**

**ATTORNEY GENERAL OF THE UNITED STATES,**
**Respondent.**

No. 03–4583.

United States Court of Appeals,
Third Circuit.

Argued Nov. 29, 2004.

April 1, 2005.

Tatiana S. Aristova, Christina L. Harding [Argued], Law Offices of John J. Gallagher, Philadelphia, PA, for Petitioner.

Douglas E. Ginsburg, John M. McAdams, Jr. [Argued], William C. Minick, U.S. Department of Justice, Office of Immigration Litigation, Washington, DC, for Respondent.

Before RENDELL, ALDISERT, and MAGILL,[*] Circuit Judges.

RENDELL, Circuit Judge.

Kote Jishiashvili, a native and citizen of Georgia, was charged with removability for being present in the United States without admission or parole. Jishiashvili has conceded removability and applied for relief in

[*] Honorable Frank Magill, Senior Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

the form of asylum, withholding of removal, and relief under the Convention Against Torture, claiming that he has been persecuted and has a reasonable fear of future persecution based on his ethnicity. At his asylum hearing, Jishiashvili presented a significant amount of evidence supporting internally consistent testimony that was also generally consistent with his asylum application. The Immigration Judge ("IJ") found that his testimony was detailed and his demeanor gave no indication of any fabrication. However, the IJ found the testimony to be implausible in certain respects and denied all relief based on an adverse credibility determination. Jishiashvili appealed to the Board of Immigration Appeals, which summarily affirmed the IJ's decision under its streamlining regulations. This petition for review followed.

## I. Factual Background

Jishiashvili claims he has been persecuted and he has a reasonable fear of future persecution for his mixed ethnicity, his mother being Abkhazian and his father being Georgian. He was the only witness at his April 25, 2001 asylum hearing, and he testified to the following facts. Jishiashvili's history of persecution began in November 1993, when he was conscripted into two years of service in the Georgian military. In August 1992, the people of Abkhazia, a region in northwest Georgia, attempted to declare their independence from Georgia. Fueled by a difference in ethnic background and language, the hostility in the Abkhazia region developed into war. Although the war had largely subsided by September 1993, there were still uprisings in the region when Jishiashvili was called, on two occasions, to serve in the Georgian army. Because of his Abkhazian heritage, Jishiashvili was opposed to fighting in the region, and when he refused to serve when he was called, he was punished. His punishment consisted of being put in solitary confinement in a small, cold, underground cell for four to five days, with no room to sit or lie down and very little to drink or eat. During this time he was also kicked and beaten with batons by officers who would yell at him, insult his intelligence, and degrade him for his Abkhazian ethnicity. When he was not detained, Jishiashvili worked in a kitchen and patrolled the Georgian–Abkhazian border once or twice. Jishiashvili's asylum application, filed February 2001, did not mention these detentions or beatings. Jishiashvili also testified that he discussed his views on the war with other Georgian soldiers of Abkhazian ethnicity, but was not aware of any more than one other soldier who was detained during the same time that he was.

After he was discharged from the military in November 1995, Jishiashvili returned to his home city of Rust'avi and started a bodybuilding business, where he was an instructor and had forty to forty-five trainees. He operated a fitness club that was located on the second floor of a building that also housed a library on the first floor and businesses on the third and fourth floors.

In February 1996, Georgian federal service agents came to Jishiashvili's club during their investigation of an August 29, 1995 assassination attempt on then Georgian President Eduard Shevardnadze. The agents showed Jishiashvili pictures of two men who they believed were involved in the assassination attempt, and Jishiashvili recognized the men as patrons of his club. In his testimony, Jishiashvili gave the names of these men as Gia Abas Jishiashvili and David Luca Jishiashvili, but claimed to know nothing more about them. The federal agents searched the club and told Jishiashvili that they would like to speak to the men pictured in the photographs.

When Jishiashvili told them he had nothing to do with the men, the agents believed he was lying to them and brought up his disobedience during his military career as evidence of his own anti-government views and political unreliability.

Jishiashvili testified that after this encounter he began receiving two to three threatening telephone calls per week, each degrading him and insulting his ethnicity. On February 9, 1998, a second assassination attempt was made on the president, and on April 15, 1998, the same federal agents paid an early morning visit to Jishiashvili at his home.[1] He testified that the agents took him in their car to a federal facility in Tbilisi, the Georgian capital. During the thirty-minute drive, Jishiashvili was seated in the backseat, with an agent on either side of him, enduring insults and degradation regarding his ethnicity. When they arrived at the facility, Jishiashvili was taken to a small room and interrogated by a Major Giakaji, who showed him the same photographs the agents had shown him previously and asked Jishiashvili to identify the same two men. After Jishiashvili identified the men and again stated that he knew them only as patrons of his club, he testified that he was taken from the room, pushed down a flight of stairs, beaten and insulted by agents, and then returned to the room where he was again asked about the two men. He was led to a one-way mirror, shown the two men in a lineup, and was again asked to identify them. The agents asked Jishiashvili to sign a statement implicating the men in the assassination attempts. When he refused, the agents took him from the room, beat him again, and then released him.

Thereafter, Jishiashvili continued to receive threatening phone calls, in which the callers insisted that he sign a statement implicating the men. Around this time he also noticed that people were lurking around his home and club, apparently monitoring his movements. On March 7, 1999, he was beaten and insulted by three men as he was returning from his club in the evening. He was hospitalized for two weeks for the injuries he sustained; on this point, his testimony was corroborated by a hospital record. He testified that when he reported the incident to the police, they took no action, explaining that they did not have the ability to guard every Abkhazian in Georgia.

Three months later, on June 6, 1999, the building where Jishiashvili's club was located was burned. The damage was largely concentrated in his club, with the other floors sustaining less damage. He testified that the firefighters found traces of gasoline and a large canister and concluded that the fire was the result of arson, but when Jishiashvili reported it to the police, they did not take any action.

Six months later, on the evening of December 15, 1999, Jishiashvili was beaten again by a group of men as he was returning home from the grocery store. He testified that the beating lasted approximately five minutes and most likely ended because his assailants feared being identified by witnesses. Before they left, the assailants threatened to kill Jishiashvili the next time they saw him.

On December 31, 1999, fearing for his life, Jishiashvili went to live with a cousin in Moscow, and on January 27, 2000, he flew from Russia to Mexico, on a Mexican visa. From Mexico, he walked to Nogales,

1. The IJ found that Jishiashvili was not contacted between the two visits by the federal agents (from February 1996 to February 1998); however, Jishiashvili testified that he received threatening phone calls and was followed by a government vehicle during this time.

Arizona and subsequently arrived in Philadelphia on February 25, 2000.

## II. Procedural History: The IJ's Opinion and the BIA's Affirmance

Jishiashvili submitted a significant amount of evidence in support of his testimony, including a military record, a report of the fire in his gym, a birth certificate, a passport, medical records, written statements by his sister, father, and mother, a letter from his mother, and background evidence on the conditions in Georgia. The evidence and his testimony were consistent in all material aspects.

In an oral decision dated February 22, 2002, the IJ denied Jishiashvili's applications for asylum, withholding of removal, and relief under the CAT based on an adverse credibility determination. In making factual findings based on Jishiashvili's testimony and the submitted evidence, the IJ remarked on the "considerable" evidence regarding the condition of Georgia and the situation of Abkhazis, noting that the evidence provided a "plausible basis to consider that Abkhazis and Georgians are subject to ill treatment." (Oral Dec. of IJ at 7.) The IJ also noted that the evidence indicated that torture persisted in conjunction with an inability to control the lowest level of government, weaknesses in carrying out impartial investigations, and impunity for those involved in improper conduct. In short, the IJ acknowledged the ethnic tension that existed in Georgia and expressed a general credence in the assertion that Abkhazis were subject to persecution. The "real issue," however, was whether Jishiashvili's testimony about the events that led him to leave Georgia really occurred, i.e., "whether his testimony [wa]s credible." (Oral Dec. of IJ at 8.)

In making his credibility determination, the IJ began by stating that "[w]ith respect to [Jishiashvili's] demeanor, the Court raises [n]o concern. In other words, the Court has not been able to detect any special clues from the respondent's manner and tone of voice here in Court to find clues about either veracity or fabrication. He g[a]ve testimony that was quite detailed with respect to all events." (Id.) The IJ remarked that Jishiashvili's attention to detail, evident by his correcting himself and his attorney on certain relatively trivial matters, could have been an indication of either authentic recall of actual events or a deliberate consistency with a well learned affidavit or statement, but it was impossible to tell.

The IJ then went on to discuss at least four main concerns with the "plausibility" of certain aspects of Jishiashvili's testimony. First, the IJ found it hard to believe that the government's investigation of the two patrons of Jishiashvili's gym for involvement in the assassination attempts on the president would have focused so closely on Jishiashvili. Although it was plausible that the police would question Jishiashvili's loyalty because of his ethnicity, it struck the IJ as unrealistic that the government's case against the two suspects would depend so heavily on the statement of the owner of the sports club they attended. Without anything in Jishiashvili's testimony suggesting that he was believed to be a co-conspirator in the assassination attempts, the IJ did not understand why the government would take the clandestine and unlawful steps of beating him and burning down his business only to have him sign a piece of paper implicating suspects that were apparently already in custody.

Second, Jishiashvili's allegation that the government burned down his gym was a source of suspicion for the IJ. The IJ commented that committing arson, especially at the risk of endangering other

businesses and a library in the same building, seemed to be a highly unlikely way for the government to proceed, even if it was interested in persecuting Jishiashvili.

Third, the IJ was suspicious of Jishiashvili's account of his military service. On this subject, the IJ noted, Jishiashvili's testimony was markedly more "vague, in general, in comparison with the detail that he gave in responding to questions where the answers already existed in his written statement." (Oral Dec. of IJ at 13.) For example, when asked to name with particularity the orders to which he conscientiously objected, Jishiashvili gave vague replies such as "bear arms" or "participate in war." The IJ was troubled by the fact that Jishiashvili, whose Abkhazian lineage was somewhat obscured by his use of his father's Georgian surname, would have revealed his ethnicity and his willingness to take a stand against government action while in the military. It was even more unbelievable that Jishiashvili did not know what happened to colleagues in the same circumstances, both as a matter of conscience and as a matter of self-interest. Also, the IJ found Jishiashvili's story to be inconsistent with a document in evidence, authored by Amnesty International, that reported that conscientious objectors in the military were typically imprisoned for a period of several months, whereas Jishiashvili testified that he had been imprisoned for a week.

Fourth, in commenting on the "substantial" evidence Jishiashvili submitted to corroborate his claim, the IJ found that the documentary evidence appeared genuine and plausible, but it did not independently establish persecution on account of his ethnicity or political opinion. The statements by Jishiashvili's family members corroborated his testimony, but were all just "skeletal outlines" of the basic events. The IJ also did not understand why Jishiashvili's parents, who had been receiving calls inquiring about their son's whereabouts, would not just tell the callers that their son had fled the country, or why Jishiashvili had not thought about instructing his parents to do so. With respect to the other documents, the medical reports appeared "genuine" and were "plausible" and "not overstated." The military record, passport, visa, and birth certificate also appeared "genuine." Although the evidence showed that Jishiashvili had been beaten up and that it was plausible that it was because of his ethnicity, none of the evidence bore on Jishiashvili's claim of unlawful government action in investigating the assassination suspects.

The IJ noted that it was a "close sort of case," but concluded that the set of circumstances alleged by Jishiashvili was not plausible on the record as established. Although Jishiashvili's "credibility [wa]s not suspect in a very material way," he did not present "sufficiently plausible and detailed evidence about the most material points of his application for political asylum to war[rant a] finding that the events to which he testified[ ] did indeed occur as he said they did." (Oral Dec. of IJ at 19.)

The BIA affirmed the IJ's decision without opinion pursuant to its streamlining regulations, rendering it the final agency determination under 8 C.F.R. § 1003.1(e)(4).

### III. Jurisdiction and Standard of Review

The BIA's jurisdiction arose under 8 C.F.R. §§ 1003.1(b), 1003.38, and 1240.15. We have jurisdiction to review the BIA's decision pursuant to 8 U.S.C. § 1252. Where the BIA issues a summary affirmance under its streamlining regulations, we essentially review the IJ's decision as if it were the decision of the BIA. *See Dia v. Ashcroft,* 353 F.3d 228, 247 (3d

Cir.2003) (en banc). Because credibility determinations are factual matters, they are reviewed for substantial evidence, *Balasubramanrim v. INS*, 143 F.3d 157, 161 (3d Cir.1998), reversible only if "any reasonable adjudicator would be compelled to conclude to the contrary," 8 U.S.C. § 1252(b)(4)(B). Given this standard, "[w]e will not disturb the IJ's credibility determination and findings of fact if they are 'supported by reasonable, substantial and probative evidence on the record considered as a whole.'" *Tarrawally v. Ashcroft*, 338 F.3d 180, 184 (3d Cir.2003) (quoting *Balasubramanrim*, 143 F.3d at 161).

## IV. Discussion

We begin our discussion by agreeing with the IJ that this is "a very close sort of case." (Asylum Hr'g Tr. at 121). There is no smoking gun in Jishiashvili's testimony, no single item upon which one could seize and objectively say, without drawing any inferences, this is where his claim fails. Hence, we agree with the IJ that Jishiashvili's entire case stands or falls on credibility.

■ Asylum applicants have the burden of supporting their claims with credible testimony. *Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir.2002) (citing *Abdille v. Ashcroft*, 242 F.3d 477, 482 (3d Cir.2001)). Because an applicant's testimony may alone be sufficient to meet his burden if it is found credible, 8 C.F.R. § 208.13(a), where the applicant is the only testifying witness, much depends on what the applicant says and how he says it. Consequently, the IJ's evaluation of the applicant and his testimony, generally referred to as a "credibility determination," is of paramount importance, and, given that the IJ has the opportunity to observe the applicant as he gives his testimony and is experienced in the work entrusted to the agency, the IJ's evaluation is typically given great deference by an appellate court reviewing a cold record on any subsequent appeal. *See, e.g., Dia*, 353 F.3d at 249; *Gao*, 299 F.3d at 276.

Because we review credibility determinations for substantial evidence, our analysis focuses on the IJ's factual findings, and we test them, with appropriate deference, against the evidence of record and the logical inferences drawn by the IJ in reasoning to his conclusions. Within the precedent controlling our review of credibility determinations, we have developed a number of constructs and principles to guide us in this analysis. In *Dia*, we collected and reiterated many of these principles. *See generally* 353 F.3d at 247–50.

■ Specifically, in *Dia*, we stated that "where we review an IJ's credibility determination, we must ask whether the determination is supported by evidence that a reasonable mind would find adequate. We look at an adverse credibility determination to ensure that it was 'appropriately based on inconsistent statements, contradictory evidences, and inherently improbable testimony ... in view of the background evidence on country conditions.'" *Id.* at 249 (quoting *In re S–M–J–(Interim Decision)*, 21 I. & N. Dec. 722 (BIA 1997)). We also noted a limitation on the deference we afford the IJ in reviewing a credibility determination, explaining that "'while we defer to the IJ on credibility questions, that deference is expressly conditioned on support in the record,' ... and 'deference is not due where findings and conclusions are based on inferences or presumptions that are not reasonably grounded in the record.'" *Id.* (quoting *El Moraghy v. Ashcroft*, 331 F.3d 195, 205, 202 (1st Cir.2003) (citation and internal

quotation marks omitted)).[2] Where the IJ rejects an applicant's testimony, the IJ must provide a "specific, cogent reason" for doing so, rather than relying on "speculation, conjecture, or an otherwise unsupported personal opinion." *Id.* at 250 (quoting *Secaida–Rosales v. INS,* 331 F.3d 297, 307 (2d Cir.2003), *Abdulrahman v. Ashcroft,* 330 F.3d 587, 597 (3d Cir.2003), and *He v. Ashcroft,* 328 F.3d 593, 595 (9th Cir.2003)). Finally, we stated that "[w]here an IJ bases an adverse credibility determination in part on 'implausibility' as the IJ did here, such a conclusion will be properly grounded in the record only if it is made against the background of the general country conditions." *Id.* (citing *Gao,* 299 F.3d at 278–79, and *He,* 328 F.3d at 603).

In the instant case, the IJ expressly accepted Jishiashvili's credibility, in the sense of observable believability. In his opinion, the IJ specifically stated that he had no concern with Jishiashvili's demeanor and that he was not "able to detect any special clues from the respondent's manner and tone of voice here in Court to find clues about either veracity or fabrication." (Oral Dec. of IJ at 8.) With this statement, the IJ effectively relegated his adverse credibility determination solely to the plausibility of certain aspects of Jishiashvili's testimony. Indeed, the "several concerns" the IJ had with Jishiashvili's testimony fell "under the [rubric] of 'plausibility.' " (Oral Dec. of IJ at 9.)

Because the IJ's adverse credibility determination was based on plausibility, we review that determination to confirm that it was "properly grounded in the record" and, to that extent, informed by the conditions in the petitioner's country. *Dia,* 353 F.3d at 250. By requiring the IJ to tether a plausibility determination to evidence in the record, including evidence of country conditions or other contextual features, and rejecting speculative or conjectural reasoning, we ensure that there is a reasoned foundation to support the conclusion that the witness's testimony was objectively implausible. We find a lack of such foundation in this case.

■ To begin, we note that the IJ cited only one document relating to country conditions, the Amnesty International report about conscientious objectors in the Georgian military. We believe this document is at best tenuous evidence of general country conditions supporting the IJ's conclusion. First, the section of the document that the IJ cited discussed the treatment of conscientious objectors of "military service . . . in Abkhazia." (Ex. 9–11 at 21.) Although susceptible of alternative interpretations, we interpret this section to discuss the treatment of those conscientiously objecting to serving in the military of Abkhazia, not the Georgian military. This interpretation finds support in the Introduction, which states that the document discusses "alleged human rights violations in two areas of Georgia *currently outside the de facto control of the Georgian authorities*-Abkhazia and South Ossetia." (Ex. 9–11 at 1 (emphasis added).) Consistent with this prefatory distinction between Georgia and Abkhazia, the document frequently refers to the "Abkhazian authorities" and "Abkhazian side" as distinguished from the "Georgian authorities" and "Georgian side." (Ex. 9–11 at 18–21.) As we understand Jishiashvili's testimony,

---

**2.** *See also Abdulrahman v. Ashcroft,* 330 F.3d 587, 597 (3d Cir.2003) (stating that "substantial deference" to a finding is to be "afforded . . . where it is grounded in evidence in the record"); *Balasubramanrim,* 143 F.3d at 162 ("[D]eference is not due where findings and conclusions are based on inferences or presumptions that are not reasonably grounded in the record, viewed as a whole.").

he was conscripted into and subsequently punished for not fighting against Abkhazians by the Georgian military, not the Abkhazian military. Second, even if we were to interpret this section as referring to the service to which Jishiashvili was conscientiously objecting, we believe the statements are too vague to support the IJ's conclusion that Jishiashvili's testimony was implausible on this point. As the IJ specifically pointed out, the document states that "[a]t least six young men were imprisoned [for being conscientious objectors] earlier this year, and at least one remains imprisoned at the time of writing." (Ex. 9–11 at 21.) The IJ apparently seized upon this statement as proof that conscientious objectors were more likely imprisoned for a period of months, not weeks, as Jishiashvili testified was his experience. But the imprecise and anecdotal nature of this statement renders it unconvincing. The time period, from "earlier this year" until "the time of writing" is vague as to both references; the IJ took the latter to correspond with the August dating of the document, but this inference is far from compelled. Additionally, the reference is anecdotally about the experience of only one man out of only six known prisoners. Without any further facts to substantiate this statement, it cannot be reasonably regarded as a dispositive statistic rendering Jishiashvili's significantly more detailed account implausible. Last, as the IJ himself noted, the report is dated August 1998, "several years after [Jishiashvili] refused military service." (Oral Dec. of IJ at 14.) In short, it seems unreasonable and contrary to *Dia'*s requirement of a solid reference to background country conditions to put so much faith in such a vague, potentially inapplicable statement to discredit Jishiashvili's detailed testimony.

Beyond the Amnesty International report, the IJ cited no other deficiencies in Jishiashvili's testimony based on objective record evidence, but instead found four factual items, as laid out in *supra* Part II, that did not seem plausible to him. As we stated above, we must examine this type of reasoning by the IJ for a "specific, cogent reason" for rejecting Jishiashvili's testimony, and we must reverse the IJ's decision if we find it to be based on conjecture or "unsupported personal opinion." *Dia*, 353 F.3d at 249–50.

The IJ first expressed suspicion regarding the extent of the government's interest in Jishiashvili as compared to others considering he was connected to the assassination suspects only as the owner of the gym they attended and, further, that the government would take so many unlawful actions against Jishiashvili, *i.e.*, beatings and arson, in its investigation. Although this suspicion is not totally frivolous, nor is it supported by substantial evidence. First of all, there is nothing in the record suggesting that Jishiashvili *was* the only person the authorities were investigating; the same agents that Jishiashvili encountered could have been conducting similar or more intense "investigations" with respect to others perhaps more closely connected to the suspects. In our reading of the record, we note that when asked who these men were at the hearing, Jishiashvili twice provided their names: "Gia Abas Jishiashvili and David Luca Jishiashvili." (Asylum Hr'g Tr. at 34, 44.) The fact that these men shared the petitioner's last name seems to us to have gone by totally unnoticed by both parties' counsel and the IJ, not to mention the BIA. This fact, though, could be important to judging the plausibility of Jishiashvili's testimony regarding the government's treatment of him. If the surname was not common, it would be more reasonable for the government to be so interested in Jishiashvili as a possible relative of the suspects. Furthermore, it is not entirely unreasonable that

in the course of the investigation Jishiashvili would be the victim of harsh treatment by the authorities. The same Amnesty International document cited by the IJ speaks at length about concerns of torture of those detained and in custody by police, as well as those conscripted into military service. (Ex. 9–11 at 2–9 (stating that "the Georgian government itself ... admitted that it was seriously concerned about torture in custody" and providing specific accounts of "periods of short-term detention by police" accompanied with "physical and psychological duress in order to force confessions or obtain other information").) The IJ himself noted that torture persisted, citing an inability to control the lowest level of government, weaknesses in carrying out impartial investigations, and impunity for those involved in improper conduct. The IJ's second ground for suspicion, the arson, stands on the same loose footing; it does not seem unreasonable, in light of this objective evidence of the alleged lawlessness of Georgian police, to believe that Jishiashvili's gym-targeted as it was-was set on fire by those investigating him.

Regarding the IJ's concern with the vagueness of Jishiashvili's account of his military service, we do not believe this is a proper ground for questioning the testimony's overall plausibility. First, the context of Jishiashvili's military service did not bear heavily on, as the IJ put it, "the key" to Jishiashvili's case, i.e., "that the government ... seeks him out because he, supposedly, has information the government wants or the power to give the signature on a document the government needs to continue its investigation into the plot or plots to assassinate the president of the country." (Oral Dec. of IJ at 19.) Second, we are not convinced that Jishiashvili's testimony that he objected to "bear[ing] arms" or "participat[ing] in war" is all that suspiciously vague, given the context.

Jishiashvili indicated that he objected to any and all military activity in Abkhazia; clearly in his mind, his objection was of a very general nature, and it is not unreasonable that he would not now be able to identify specific orders to which he objected during his service. Furthermore, while the IJ's expectation that Jishiashvili should have known more about the fate of similarly situated colleagues is understandable, it is not implausible that Jishiashvili might lack specific knowledge about the fate of others.

Last, regarding the IJ's concern with the fact that Jishiashvili's parents had not told callers asking for their son that he had left the country, we do not accept this circumstance as inherently implausible. The IJ apparently believed that by telling the callers that their son had fled the country, the callers would realize the futility of their efforts and cease harassing Jishiashvili's family. It is not unreasonable, however, to believe that giving the callers this information would yield an opposite result, causing them to believe that the parents knew where he was and to focus their investigation and abuse on the parents, either for retribution, more information about their son, or to get them to persuade Jishiashvili to return to Georgia.

As a final consideration in reviewing the IJ's decision, we find it important that the IJ credited significant portions of Jishiashvili's testimony and evidence. Specifically, (1) the IJ found plausible Jishiashvili's claims that the police questioned his loyalty in light of his ethnicity and experience in the military; (2) without evidence regarding discipline in the Georgian military, the IJ did not find it "incredible per se" that Jishiashvili refused military orders and was punished only by a few days of solitary confinement before being allowed to "have his way"; (3) the IJ found the medical documents submitted by Jish-

iashvili to be plausible and consistent with Jishiashvili's testimony; (4) the IJ found that the other documents submitted by Jishiashvili, *e.g.,* the birth certificate, passport, visa, and military record, appeared genuine, although they did not establish grounds for asylum in and of themselves; and (5) the IJ found it plausible that Jishiashvili could have been beaten up because of ethnic and/or political reasons, even though "the key" to his case was not that he was beaten up because he is Abkhazian or half Abkhazian, but that the government sought him out to sign a document needed to continue the investigation into the assassination attempts.

■ The IJ's overall credibility determination does not necessarily rise or fall on each element of the witness's testimony, but rather is more properly decided on the cumulative effect of the entirety of all such elements. Where, as here, the asylum applicant has presented testimony that was for the most part quite detailed, internally consistent, materially in accord with his asylum application, and accepted by the IJ, and there is supportive evidence of general country conditions and some corroborative documentation of the applicant's testimony, the IJ is not justified, under a substantial evidence standard and our precedent in *Dia,* in concluding that the applicant is not credible based on a few equivocal aspects not logically compelled by the record or by reason or common sense. Furthermore, where the record as a whole appears to support a grant of relief, we will remand for further consideration where the IJ's ultimate ruling seems to be inconsistent with his own finding as to the petitioner's credibility. *See Wu v. Ashcroft,* 393 F.3d 418, 425 (3d Cir.2005) ("[W]here, as here, the Immigration Judge finds a witness to be credible, but then renders a decision that is contrary to that testimony without explaining why, we cannot say at this point

that such a decision is supported by substantial evidence."). Such an inconsistency evidences a decision based on "unsupported personal opinion" rather than a "specific, cogent reason" for rejecting the petitioner's testimony. *Dia,* 353 F.3d at 249–50.

In short, we cannot agree with the IJ's conclusion that Jishiashvili had "not presented sufficiently plausible and detailed evidence about the most material points of his application for political asylum to [warrant the] finding that the events to which he testified did indeed occur as he said they did." (Oral Dec. of IJ at 19.) Indeed, we conclude that the opposite is true, and that the IJ's adverse credibility determination was not based on substantial evidence.

## V. Conclusion

For the foregoing reasons, we will remand to the BIA to remand to the IJ with instructions to develop the record further or provide further support for his conclusion.

ALDISERT, Circuit Judge, Concurring.

Although I am pleased to join the opinion of the Court in all respects, I wish to set forth my own view that there is a distinction between review of narrative or historical facts and review of plausibility determinations.

The IJ here decided that the Petitioner's testimony was credible in the sense that nothing he observed cast doubt on the believability of the testimony. Specifically, the IJ stated that he did not "detect any special clues from the respondent's manner and tone of voice" which could form the basis for his credibility determination. (Op. of the IJ at 8.) In the context of immigration cases, we will not disturb credibility determinations so long as they are supported by substantial evidence.

Similarly, we accept narrative or historical facts found by a district judge unless upon review we decide that they are clearly erroneous.[3] *See Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 574–576, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) ("When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) [Federal Rules of Civil Procedure] demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said. *See Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).")

But the issue before us is not the findings of narrative or historical facts.

Judge Rendell explains clearly how the IJ makes four findings of implausibility. Each finding starts with the narrative or historical facts but then moves from these narrative or historical facts to inferences which are "not logically compelled by the record or by reason or common sense." (Court Op. at 22.) And here I believe that Judge Rendell was right on the nose.

Elsewhere, I have explained that an inference is a process in which one proposition (a conclusion) is arrived at and affirmed on the basis of one or more other propositions, which were accepted as the starting point of the process.[4] This may be defined as a mental process in which a thinker passes from the apprehension of something given, the datum, to a conclusion related in a certain way to the datum

and accepted only because the datum has been accepted.

It is a process where the thinker passes from one proposition to another that is connected with the former in some way. But, for the passage to be valid, it must be made according to the laws of logic that permit a reasonable movement from one proposition to another. Inference, then, is any passing from knowledge to new knowledge. The passage cannot be mere speculation, intuition or guessing.

The key to a logical inference is the reasonable probability that the conclusion flows from the evidentiary datum because of past experiences in human affairs.

Where an administrative judge draws an inference of plausibility or implausibility, he or she steps outside the realm of finding narrative or historical facts. Here I go a little further than Judge Becker, concurring in *Abdulrahman v. Ashcroft,* 330 F.3d 587, 600 (3d Cir.2003) (concluding that certain findings of implausibility are just "barely" in "the realm of fact finding"). This is because the concept of plausibility, by definition, is something that is added to naked facts. It takes place in the mind and is modified by individual bias. Thus, characterizing a statement as plausible is to conclude that it is "reasonable or probable (though speculative), apparently acceptable or trustworthy (sometimes with the implication of mere appearance)." *Shorter Oxford English Dictionary* 2238 (5th ed.2002).

The process at a hearing or court trial must be parsed. Testimony is presented.

---

**3.** Over thirty years ago we defined clearly erroneous as follows: We accept the factual determination of the judge as a fact-finder unless that determination "either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the support-

ive evidentiary data." *Krasnov v. Dinan,* 465 F.2d 1298, 1302 (3d Cir.1972).

**4.** Ruggero J. Aldisert, *Logic for Lawyers: A Guide to Clear Legal Thinking* 26–27 (3d ed.1997).

The fact-finder decides to credit or reject it. If credited, it becomes a part of the findings of fact. When the testimony is credited and becomes a fact,[5] as here, a reviewing court is as competent as an immigration judge to draw logical inferences from those facts. In evaluating plausibility, these are inferences of reasonableness, probability, acceptability and trustworthiness to be drawn from naked facts. Or, as the logicians would put it, to the same extent as a fact-finder, a reviewing court may exercise the mental process, in which a thinker passes from the apprehension of something given, the datum (facts found by the fact finder), to a conclusion (plausibility *vel non* ) related in a certain way to the datum and accepted only because the datum has been accepted.[6]

Thus, determining plausibility *vel non* is a different breed of cat than evaluating credibility.

When the Court in *Anderson* and *Wainwright* speak of an appellate court's deference to a fact-finder's evaluation of credibility, I like to think that it's for the same reasons that a reviewing court allocates the competence of exercising discretion to trial tribunals. In my view, no one has explained why we do this as well as Professor Maurice Rosenberg, late of Columbia Law School, in *Judicial Discretion of the Trial Court, Viewed from Above*, 22 Syracuse L.Rev. 635, 660–661 (1971). A trial judge has "the superiority of their nether position." Rosenberg said:

It is not that they know more than their loftier brothers and sisters; rather the trial judge sees more and senses more. In the dialogue between the appellate judges and trial judges, the former often seem to be saying: "You

were there. We do not think we would have done what you did, but we were not present and we may be unaware of significant matters, for the record does not adequately convey to us all that went on at the trial. Therefore, we defer to you." [7]

But determining plausibility or implausibility is neither finding facts nor exercising discretion. Instead, it's a process that adds a patina to bare facts. And from our loftier perch we are in as good a position as the trial judge to decide if it was O.K. to do just that.

**Jose BORGES, Petitioner**

**v.**

5. I am reminded of the story of the three baseball umpires describing how they call balls and strikes.

  The first said, "I call 'em as I see 'em."
  The second said, "I call 'em as they are."
  The third said, "They ain't nothing 'til I call 'em!"
  So it is with testimony at a hearing. They ain't facts until the fact finder calls them that.

6. There may be exceptions that are not present here. Where the IJ relies on his or her expert knowledge of general country conditions to draw inferences of plausibility, it may be that these inferences are worthy of deference.

7. I have paraphrased his language. The author wrote in an era when it was proper to use the pronoun "he" in a universal sense.