

Villanova University School of Law

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-27-2006

# Arslan v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-3578

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Arslan v. Atty Gen USA" (2006). *2006 Decisions*. Paper 687.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/687

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 05-3578

MUSTAFA ARSLAN,
                                Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,
                                Respondent

PETITION FOR REVIEW OF A DECISION OF
THE BOARD OF IMMIGRATION APPEALS
Agency No. A95-833-769

Submitted Under Third Circuit LAR 34.1(a)
June 27, 2006

Before: BARRY, VAN ANTWERPEN and SILER,[*] Circuit Judges

(Opinion Filed: July 27, 2006)

OPINION

---

[*] The Honorable Eugene E. Siler, Senior Circuit Judge, United States Court of Appeals for the Sixth Circuit, sitting by designation.

BARRY, <u>Circuit Judge</u>

Mustafa Arslan petitions for review of a decision of the Board of Immigration Appeals ("BIA") affirming without opinion the decision of an Immigration Judge ("IJ") ordering his removal. Arslan had applied for asylum, withholding of removal, and withholding of removal under the Convention Against Torture ("CAT withholding"). Because the IJ's adverse credibility finding was supported by substantial evidence, we will deny the petition for review.

Arslan is a native and citizen of Turkey. He entered the United States on July 23, 2002 in Miami, without a valid visa or entry documents. On April 23, 2003, the former Immigration and Naturalization Service ("INS")[1] served him with a Notice to Appear, alleging that he was removable as "[a]n alien present in the United States without being admitted or paroled," 8 U.S.C. § 1182(a)(6)(A)(i), and as an alien arriving without valid entry documents, <u>id.</u> § 1182(a)(7)(A)(i)(I). He conceded removability at a hearing before the IJ on May 16, 2003. He submitted an application for asylum, withholding of removal, and CAT withholding on July 10, 2003.

In the affidavit he attached to his application, Arslan alleged that he is a Muslim who was persecuted in Turkey on account of his religion and his activities on behalf of the Fazilet ("Virtue") political party. He attended a peaceful demonstration on June 18,

---

[1] On March 1, 2003, the functions of the INS were transferred from the Department of Justice to the Department of Homeland Security. <u>See</u> Homeland Security Act of 2002, Pub. L. No. 107-296, 110 Stat. 2135 (Nov. 25, 2002).

1999 to protest the Turkish government's closure of Islamic schools. The police arrived, beat up protesters, and arrested Arslan and others. At the police station, he was stripped naked, sprayed with cold water, and beaten, before being released without being charged. He continued to attend Fazilet meetings until the government banned the party in June, 2001. His sister was banned from attending college because she wore a head scarf. On April 11, 2002, he attended another demonstration on behalf of a new religious freedom political party, Soudet. Again, he and others were arrested, stripped, sprayed with cold water, and beaten. His boss then fired him because of his religious beliefs. Although he stopped going to political meetings, the police came to his house on May 31, 2002 to question him about a Soudet rally. He had not attended, but the police warned him that he would be in "very dangerous trouble" if he did not stop going to demonstrations. He then decided to come to the United States because of its reputation for religious freedom.

Arslan testified at a hearing before the IJ on February 25, 2004. An interpreter was present, and Arslan testified in a mixture of Turkish and English. He repeatedly answered questions about his personal experiences with protestations of confusion, mostly directed at the reasons for the Turkish authorities' alleged actions against him. A few excerpts illustrate the form and substance of his testimony:

> MR. ROTHMAN TO MR. ARSLAN
> Q. What type of religious school did you attend?
> A. It was a regular school, but it was a religious school.
> JUDGE TO MR. ARSLAN
> Q. What do you mean by a religious school?
> A. I don't know what they were thinking, that's how they

3

accepted that.

Q. Who accepted that, what are you talking about?

A. Whatever lessons they were getting, we were getting as well.

Q. Who is they, who are you talking about?

A. I don't understand?

. . .

Q. Now sir, let me try and understand. You said you went to a religious school. What kind of religious school is this?

A. It's just named, it's a religious school, 99 percent, it's Muslim in Turkey.

Q. What was 99 percent Muslim, sir?

A. The majority is Muslim. They are saying that schools, religious schools, whatever lessons we were learning –

Q. Sir –

A. It's called a religious school or whatever, I still, we don't understand.

. . .

MR. ROTHMAN TO MR. ARSLAN

Q. And what type of activities would you be involved in as a member?

A. We were being restricted as far as our independence, freedom.

JUDGE TO MR. ARSLAN

Q. Sir, the question was, what type of activities did you partake in?

A. What I like about the party was religiously only religious freedom of people because Turkey is a Muslim nation, there was no pressures on that, but this Party, not only for the Muslims but generally for all people, and if I'm a human being, I would like to be a member of a country that accepts people as human beings. I would like to have worked under Party leaders that had that in mind.

. . .

MR. ROTHMAN TO MR. ARSLAN

Q. Can you tell us about the protest which you attended?

A. Yes.

Q. What did you do during the protest?

A. There is Party, a Facilet Party (indiscernible) in these protests. The government had closed that Party, the reason is, we have no idea.

4

Q. Were you at the protest?

A. I was there, yes.

JUDGE TO MR. ARSLAN

Q. Okay, so what happened, when did this occur?

A. It happened in Toro. We were holding some plaques up.

Q. What date was this, sir? Sir, you're testifying half in English and half in Turkish, for the record.

A. It was a date I don't know.

. . .

MR. ROTHMAN TO MR. ARSLAN

Q. Your sister (indiscernible)

A. My sister? My sister had one of the university exams, but because her hair was covered it was very difficult to, I can't even tell you all this here.

Q. What, if anything, did you --

JUDGE TO MR. ARSLAN

Q. Well where is it that you think you're going to tell me?

A. This is something that can't be explained, it has to be lived.

Q. Okay sir, well this is your golden opportunity to explain it to me so I can understand it. You can't expect me to go live it.

A. That's what I'm trying to explain. Nobody's doing things by the rules. They were really pressuring us, then we protested and it was over, they took us inside, the police, beating us up, putting cold water on us –

Q. When did this occur?

A. After this protest

Q. When did this occur?

A. '98.

Q. In '98?

A. No, it's not '98.

Q. When was it, sir?

A. I know the year, so I don't remember the months.

Q. You know the year, but you don't remember the month, for the record he's speaking in English. Now sir, whether it's in English or Turkish, can you tell me when this arrest occurred or this detention that you're trying to tell me about? You said it's not in 1998, so do you know when it was?

A. 2001, it happened. It was June 16th or so.

. . .

MR. ROTHMAN TO MR. ARSLAN

Q. How often did the police come to your house?
A. I don't, didn't want to go to the parties and all of the activities of my Party because of I was feeling very frightened. They were threatening.
Q. What kind of threats?
A. You'll never be able to see your family again. I don't want to understand this, I don't.
Q. What, if anything else, would the police do besides (indiscernible)
A. If I knew the answer to that.

At the close of the hearing, in an oral opinion, the IJ denied Arslan all relief. She concluded that he had not met his burden of proof, finding him "not credible nor persuasive in the least bit." She found his testimony "inarticulate and devoid of any rational basis to support a claim for asylum" and cited several specific instances of vagueness and evasion. She mentioned, for example, his inability to clarify why he called his high school a "religious school" and his difficulty in settling on the date of the protest, in the end naming a date different from the one he named in his affidavit. She also found significant the lack of supporting affidavits from family members in Turkey who could have corroborated his stories of the various incidents. She denied his requests for relief and ordered him removed. Arslan appealed to the BIA, which affirmed in a single-judge opinion on June 28, 2005, under its streamlining regulations. See 8 C.F.R. § 1003.1(e)(4). Arslan filed a timely petition for review.[2]

---

[2] We have jurisdiction pursuant to 8 U.S.C. § 1252. Where, as here, the BIA summarily affirms the decision of an IJ, we review the decision of the IJ as though it were the decision of the BIA. Jishiashvili v. Attorney General, 402 F.3d 386, 391 (3d Cir. 2005). We review factual findings, including credibility determinations, for support by

The Attorney General may grant asylum to a "refugee." 8 U.S.C. § 1158(b)(1). A refugee is defined, in relevant part, as one "who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, [his home] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). Withholding of removal is similar: An alien may not be removed to a country where the alien's life or freedom would more likely than not be threatened on one of these five enumerated grounds. 8 U.S.C. § 1231(b)(3); INS v. Stevic, 467 U.S. 407, 429 (1984). Under CAT withholding, an alien may not be removed to a country where it is more likely than not that he or she would be tortured. 8 C.F.R. § 1208.16(c)(1). The applicant bears the burden of proof of establishing that he qualifies under one of these standards. 8 C.F.R. §§ 1208.13(a), 1208.16(b), 1208.16(c)(2). "The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." Id.; see In re M—— D——, 21 I. & N. Dec. 1180, 1182 (B.I.A. 1998) ("[W]here an alien's testimony is the only evidence available, it can suffice where the testimony is believable, consistent, and sufficiently detailed to provide a plausible and

substantial evidence. Id. at 392. Such findings will be upheld if "supported by reasonable, substantial and probative evidence on the record considered as a whole." Tarrawally v. Ashcroft, 338 F.3d 180, 184 (3d Cir. 2003) (internal quotation marks omitted). They may only be overturned if "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4). Adverse credibility determinations must be "supported by specific cogent reasons." Gao v. Ashcroft, 299 F.3d 266, 276 (3d Cir. 2002).

coherent account of the basis of the alien's alleged fear.").

Arslan argues that the reasons the IJ cited for her adverse credibility determination were improper. He blames his inarticulate performance at the hearing on his nervousness and objects that the discrepancy in the dates of his arrest was "a minor inconsistency" that does not, in our words, "involve the heart of the asylum claim." Gao, 299 F.3d at 272 (internal quotation marks omitted). We believe, however, that the IJ's stated reasons "bear a legitimate nexus to the [adverse credibility] finding," Balasubramanrim v. INS, 143 F.3d 157, 162 (3d Cir. 1998). While in other circumstances we might not place such reliance on such seemingly minor matters as an inconsistent date and the petitioner's inability to explain further the meaning of the phrase "religious school," here we find two factors particularly significant.

First, Arslan's detentions for taking part in political protests were central to his claims of intimidation and retaliation. They involved the most severe mistreatment he alleged, and they were the proximate cause of the authorities' interest in him and his family. As such, they were at the "heart" of his claims, and it was reasonable for the IJ to expect him to describe those events. Second, and perhaps more importantly, as described above, Arslan's testimony was by turns elusive, incoherent, nonresponsive, and confused. Had he been more detailed in the remainder of his testimony, such matters as the year and date of an arrest might not have loomed so large in the case. As it was, the date of his arrest was the most specific material fact either his own lawyer or the IJ could elicit from

him. As Arslan could not testify consistently either about matters central to his claim or when he was at his most specific, the IJ justifiably discounted the remainder of his testimony.

Stated somewhat differently, the IJ's adverse credibility determination depended not so much on specific inconsistencies in Arslan's testimony as on the IJ's conclusion that his testimony was not "sufficiently detailed to provide a plausible and coherent account" of the alleged persecution he suffered. In re M—— D——, 21 I. & N. Dec. at 1182. Where, as here, it is not, the applicant has simply failed to provide the necessary evidence to substantiate his claim, whether or not this failure is termed an "adverse credibility determination." Arslan did not or could not explain in any coherent detail why he was prevented him from attending college, what he meant by "religious school," what activities he was involved in as a member of Fazilet, what he did at the protests, when the protests were, what happened to him after his arrest, the nature of his work as an accountant, how often the police came to his house, or the nature of the threats they made against him. We do not require an IJ to be more specific in describing inconsistencies in a petitioner's testimony than the petitioner himself has been in testifying. Accordingly, we conclude that the IJ's adverse credibility determination was supported by substantial evidence.[3]

---

[3] Arslan also argues that the IJ improperly noted that his family did not supply corroborating evidence. As he did not raise this issue before the BIA, he has not properly exhausted it, and we may not consider it. 8 U.S.C. § 1252(d)(1).

We will deny the petition for review.